Filed 12/6/17; pub. order 12/8/17 publishing the full opn. (see end of opn.)

# <u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u><sup>*</sup>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

## (Plumas)

----

| | |
|---|---|
| DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al., | C074879, C076008 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. CV09-00205 (lead), CV09-00231, CV09-00245, CV10-00255, CV10-00264) |
| v. | |
| EUNICE E. HOWELL et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Plumas County, Leslie C. Nichols, Judge. (Retired judge of the Santa Clara Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed in part and reversed in part.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Robert W. Byrne, Assistant Attorney General, Gary E. Tavetian, Evan Eickmeyer and Daniel M. Lucas, Deputy Attorneys General, for Plaintiffs and Appellants Department of Forestry and Fire Protection.

---

<sup>*</sup> Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication from inception through the end of part I.B. of the Discussion as well as the Disposition.

1

Gary S. Garfinkle; Kenneth P. Roye for Plaintiffs and Appellants Brandt et al. and Grange Insurance Association.

Anderlini & McSweeney LLP, Terry Anderlini and G. Chris Andersen for Plaintiffs and Appellants Richard Guy et al. and John Cosmez et al.

Downey Brand LLP, William R. Warne, Michael J. Thomas, Annie S. Amaral and Meghan M. Baker for Defendant and Respondent Sierra Pacific Industries.

Matheny Sears Linkert & Jaime, LLP, Richard S. Linkert and Julia M. Reeves for Defendants and Respondents W.M. Beaty & Associates, Inc., and Ann McKeever Hatch, as Trustee, etc., et al.

Rushford & Bonotto, LLP, Phillip R. Bonotto and Derek Vandeviver for Defendants and Respondents Eunice E. Howell, etc., J.W. Bush and Kelly Crismon et al.

Deborah J. La Fetra and Lawrence G. Salzman for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.

Morrison & Forester LLP, Christopher J. Carr, William M. Sloan, and Navi Singh Dhillon for Michael Cole and Tom Hoffman, as Amici Curiae on behalf of Defendants and Respondents.

Mark Brnovich, Attorney General (Arizona); Doug Peterson, Attorney General (Nebraska); Adam Paul Laxalt, Attorney General (Nevada); Sean D. Reyes, Attorney General (Utah), Parker Douglas, Chief Federal Deputy, and Aaron G. Murphy, Assistant Solicitor General; Brad D. Schimel, Attorney General (Wisconsin), as Amici Curiae on behalf of Defendants and Respondents.

A wildfire started in Plumas County on September 3, 2007, and burned approximately 65,000 acres over the course of multiple weeks. This fire, dubbed the "Moonlight Fire," was at the center of several actions filed by plaintiffs Department of Forestry and Fire Protection (Cal Fire), Grange Insurance Association, and multiple landowners[1] in 2009 and 2010 against defendants Eunice E. Howell, individually, and on

---

[1] Cal Fire's action was deemed the lead case in this complex civil litigation (Plumas Super. Ct. No. CV09-00205). Landowner plaintiffs include, in order of appearance: case No. CV09-00231: Gary L. Brown and Sharon Brown; William R. Butler and Peggie L. Butler; Janet Farmer; Andrea C. Fox and Lynn K. Fox; William C. Goss; K. Ronald

2

behalf of Howell's Forest Harvesting (hereafter Howell)—the designated lead defendant and respondent; Kelly Crismon; J.W. Bush; Sierra Pacific Industries (Sierra Pacific); W.M. Beaty and Associates, Inc. (Beaty); and multiple landowner defendants (landowner defendants)[2] for recovery of fire suppression and investigation costs and for monetary damages.

On the eve of trial in July 2013, the consolidated actions were dismissed following a hearing on a motion for judgment on the pleadings and for presentation of a prima facie

Morgan and Dorothea D. Morgan, individually and as trustees of the Orion Trust, LTD, dated October 1, 1993, and the Evergreen Trust, dated 1985; Patricia Qualls; George B. Wieck and Dorta Lee Wieck; Donald J. Wilson; Richard A. Guy and Edith E. White; case No. CV10-00255: James H. Brandt and Ellen E. Brandt, individually and as trustees of the James H. Brandt Trust, dated October 7, 2004; and case No. CV10-00264: Robert V. Kile and Dawn A. Kile, as cotrustees of the Kile Family Trust, dated October 13, 2004; Erik Weber and Sally Weber; Robert Cross; Kenneth J. Zeits and Jessie Zeits, as cotrustees of the Zeits Family Trust; and John Cosmez and Christine Cosmez. Grange Insurance Association appeared to recover damages paid to some of these landowner plaintiffs (case No. CV09-00245).

[2] Landowner defendants include Ann McKeever Hatch, as trustee of the Hatch 1987 Revocable Trust; Richard L. Greene, as trustee of the Hatch Irrevocable Trust; Brooks Walker, Jr., as trustee of the Brooks Walker, Jr., Revocable Trust and the Della Walker Van Loben Sels Trust for the Issue of Brooks Walker; Jr.; Brooks Walker III, individually and as trustee of the Clayton Brooks Danielsen Trust, the Myles Walker Danielsen Trust, the Margaret Charlotte Burlock Trust, and the Benjamin Walker Burlock Trust; Leslie Walker, individually and as trustee of the Brooks Thomas Walker Trust, the Susie Kate Walker Trust, and the Della Grace Walker Trust; Wellington Smith Henderson, Jr., as trustee of the Henderson Revocable Trust; Elena D. Henderson; Mark W. Henderson, as trustee of the Mark W. Henderson Revocable Trust; John C. Walker, individually and as trustee of the Della Walker Van Loben Sels Trust for the Issue of John C. Walker; James A. Henderson; Charles C. Henderson, as trustee of the Charles C. and Kirsten Henderson Revocable Trust; Joan H. Henderson; Jennifer Walker, individually and as trustee of the Emma Walker Silverman Trust and the Max Walker Silverman Trust; Kirby Walker; and Lindsey Walker or Lindsey Walker-Silverman, individually and as trustee of the Reilly Hudson Keenan Trust and the Madison Flanders Keenan Trust.

case pursuant to *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367 (*Cottle*)[3] after the trial court concluded Cal Fire could not as a matter of law state a claim against Sierra Pacific, Beaty, or landowner defendants, and that no plaintiff had presented a prima facie case against any defendant. After judgment was entered, the trial court awarded defendants costs without apportionment amongst plaintiffs. It also ordered Cal Fire to pay to defendants attorney fees and expert fees totaling more than $28 million because defendants as prevailing parties were entitled to recover attorney fees on either a contractual basis or as private attorneys general, or alternatively as discovery sanctions. The trial court additionally imposed terminating sanctions against Cal Fire. Plaintiffs appeal, challenging both the judgment of dismissal (case No. C074879) and the postjudgment awards (case No. C076008).[4] Plaintiffs also request that any hearings on remand be conducted by a different judge.

In the published portion of this opinion, we conclude the trial court's order dismissing the case as to all plaintiffs based on their failure to present a prima facie case at a pretrial hearing under the authority of *Cottle* must be reversed because the hearing was fundamentally unfair: Plaintiffs were not provided adequate notice of the issues on which they would be asked to present their prima facie case. However, we conclude the trial court did properly award judgment on the pleadings against Cal Fire. In light of these conclusions, in the unpublished portion of this opinion, we find the trial court's award of costs to defendants as prevailing parties as to any plaintiff but Cal Fire is necessarily vacated, and because the trial court did not apportion costs, we must remand

---

[3] *Cottle* allows a trial court overseeing complex civil litigation to require a party to present a prima facie claim establishing some element of their cause of action prior to trial in a nonstatutory procedure established by the trial court based on its "inherent equity, supervisory and administrative powers." (*Cottle*, *supra*, 3 Cal.App.4th at pp. 1376-1377, 1381.)

[4] The two appeals were consolidated for purposes of oral argument and decision only.

the costs award to the trial court for further proceedings to determine which costs Sierra Pacific, Beaty, and landowner defendants may recover from Cal Fire. Also in the unpublished portion of this opinion, we conclude the trial court erred in awarding attorney fees to the prevailing parties, and that the award of monetary discovery sanctions must be reversed and remanded for further proceedings. We affirm, however, the imposition of terminating sanctions against Cal Fire. Finally, we reject plaintiffs' requests that we order any remand proceedings be heard by a different judge.

## FACTUAL AND PROCEDURAL BACKGROUND

Cal Fire's investigation of the Moonlight Fire determined that the fire started on property owned by landowner defendants and managed by Beaty. Sierra Pacific purchased the standing timber on the property, and contracted with Howell, a licensed timber operator, to cut the timber. On the day the Moonlight Fire began, two of Howell's employees, Bush and Crismon, were working on the property installing water bars.[5] Cal Fire's investigators concluded the fire began when the bulldozer Crismon was operating struck a rock or rocks, causing superheated metal fragments from the bulldozer's track to splinter off and eventually to ignite surrounding plant matter, and that the fire was permitted to spread when Bush and Crismon failed to timely complete a required inspection of the area where they had been working that day.

Over the course of four years, the parties engaged in extensive discovery and pretrial motions in both this consolidated action and in a concurrent federal action. The trial court designated the state court action as complex litigation under California Rules of Court, rule 3.403(b) and Standard 3.10 of the California Standards of Judicial Administration. About three months before trial was to commence, retired Judge Leslie C. Nichols was appointed to preside over all proceedings in this case. Beginning in June

---

[5] Water bars are berms or mounds designed to control erosion.

2013, Judge Nichols ruled on nearly 100 motions in limine and reviewed the thousands of pages that made up the record in the case, including the trial briefs submitted by the parties on July 15, 2013.  In a footnote in its trial brief, Sierra Pacific purportedly moved for judgment on the pleadings as to Cal Fire, contending Cal Fire had not asserted a cause of action pursuant to Health and Safety Code sections 13009 or 13009.1,[6] which were the sole basis for Cal Fire to recover its fire suppression and investigation costs.  Sierra Pacific asserted Cal Fire's claims premised on common law should be dismissed prior to trial.

On July 22, 2013, exactly one week before trial was set to commence, the trial court issued a "notice to counsel."  In that notice, the trial court indicated that during the previously scheduled pretrial hearing—set for July 24, 25, and 26 (if necessary)—it would be prepared to hear any motions for judgment on the pleadings defendants intended to advance; it would share its views on the likelihood certain jury instructions would be presented; it would address whether common law claims could be asserted; it would also discuss with counsel and issue rulings regarding issues raised during the hearing including whether expert testimony would be required to present evidence of the standard of care, and, if so, the viability of claims and evidence supporting them.  The court also indicated it "may, with the assistance of counsel, identify claims or issues susceptible to the conduct of a hearing authorized by *Cottle*[, *supra*,] 3 Cal.App.4th [at page] 1381 . . . that is to determine whether a prima facie case can be established before the start of the trial."

At the end of this pretrial hearing, the trial court entered orders dismissing the case based on its finding that all plaintiffs failed to make a prima facie showing that they could sustain their burden of proof against any defendant, and granting an oral motion for

---

[6] Undesignated statutory references are to the Health and Safety Code.

6

judgment on the pleadings against Cal Fire only as to Sierra Pacific, Beaty, and landowner defendants, based on its finding that sections 13009 and 13009.1 did not provide a legal basis for relief as to those parties.[7] Judgment of dismissal was entered in favor of defendants on July 26, 2013.

Approximately six months after the judgment of dismissal was entered, the trial court heard plaintiffs' motions to tax defendants' costs. Following extensive briefing and argument by the parties, the trial court awarded costs to all defendants, for which it made all plaintiffs jointly and severally liable.

Postjudgment, the trial court also heard defendants' motions for attorney fees, expenses, and discovery sanctions. In September 2013, the trial court established a phased briefing schedule for the motions, with the parties to first focus on entitlement to the fees, expenses, and sanctions, and thereafter to focus on the proper amount, if any, of such an award. In late October 2013, after defendants had filed their opening briefs in the first phase of postjudgment motions, defendants informed the trial court they had learned of new evidence Cal Fire had failed to produce during pretrial discovery in violation of previous court orders. As a result of this development, Cal Fire acknowledged it had " 'inadvertently' " failed to produce the document in question and some 5,000 other pages of responsive documents. The trial court ordered Cal Fire to produce the documents, and all responsive documents, by the end of October 2013. Cal Fire produced about 5,000 pages of documents and, at a court appearance in early November 2013, represented to the trial court that it had produced all responsive documents. A couple of weeks later, at the end of its brief relating to the earlier production of documents, Cal Fire acknowledged that there were an additional 2,000 pages of

---

[7] One plaintiff, California Engels Mining Company, dismissed the case against defendants with prejudice in exchange for a waiver of costs on the eve of trial and is not subject to the challenged order of dismissal.

responsive documents that still had not been produced.  It produced those documents in late November 2013.

The trial court found it was appropriate to assess monetary and terminating sanctions against Cal Fire for engaging in pervasive discovery abuses.  Among the enumerated exemplar abuses the trial court identified were Cal Fire's failure to produce responsive documents in violation of court orders, false deposition testimony by Cal Fire's lead investigator, falsification of interview statements incorporated into Cal Fire's discovery responses, spoliation of Cal Fire's investigator's notes, and inclusion of false reports in Cal Fire's discovery responses.  The trial court also found defendants were entitled to cost-of-proof expenses for disproving Cal Fire's denial of certain requests for admission.  Finally, the trial court found defendants were entitled to attorney fees as prevailing parties both on a contractual basis (Civ. Code, § 1717) and because the case resulted in a public benefit (Code Civ. Proc., § 1021.5).

Based both on its inherent authority and the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.), the trial court imposed terminating sanctions in favor of all defendants and against Cal Fire.  In addition, the trial court collectively awarded Beaty and landowner defendants attorney fees and expert witness fees of $6,146,901.41 as "a prevailing party," and made Cal Fire liable for the entirety of the award.  The trial court also ordered Cal Fire to pay an equal amount as a sanction, but stated that the entire obligation established by the order was $6,146,901.41.  The trial court also collectively awarded attorney fees of $1,166,155 and expert costs of $405,586.08 to Howell, Bush, and Crismon, either as discovery sanctions or prevailing parties.  Finally, the trial court awarded Sierra Pacific attorney fees and expert fees and costs of $21,881,484, as discovery sanctions or in the alternative as a prevailing party.

8

Additional factual and procedural information is provided as relevant in the ensuing discussion.[8]

## DISCUSSION

### I. Challenges to Judgment of Dismissal

Plaintiffs collectively challenge the trial court's judgment of dismissal by challenging, on both procedural and substantive grounds, its order finding plaintiffs had not presented a prima facie case. Cal Fire also separately challenges the trial court's order granting judgment on the pleadings based on its conclusion sections 13009 and 13009.1 do not permit Cal Fire to state claims arising from common law negligence theories. We reverse the trial court's judgment of dismissal based on its *Cottle* hearing because we conclude the conduct of that hearing violated defendants' procedural due process rights.[9] However, we affirm the trial court's judgment of dismissal to the extent it was premised on its grant of judgment on the pleadings because we agree sections 13009 and 13009.1 do not incorporate common law theories of negligence as a basis for recovery.

### A. *Cottle Hearing*

Plaintiffs challenge the trial court's dismissal of the action, raising procedural and substantive challenges to the trial court's provision of notice of a hearing based on *Cottle*

---

[8] We deny the multiple requests for judicial notice made in this court because the information presented therein, relating to the federal litigation premised on the Moonlight Fire and the amount of notice given prior to a *Cottle* hearing in two unrelated cases, is not relevant or necessary to our resolution of the issues on appeal in cases Nos. C074879 and C076008. (Evid. Code, §§ 452, 459.)

[9] We would address plaintiffs' challenge to the dismissal based on the *Cottle* hearing regardless of how we rule on the dismissal pursuant to the motion for judgment on the pleadings because judgment on the pleadings was entered only as to one plaintiff and some of the defendants.

9

and its finding that plaintiffs failed to present a prima facie case in support of their causes of action.  Based on our conclusion that the hearing suffered prejudicial procedural errors, we need not reach the parties' substantive challenges to the trial court's order.  As a result of this conclusion, we reverse the trial court's judgment of dismissal premised on its finding plaintiffs failed to present a prima facie case in support of their causes of action.

      1.    Additional background.

One week before trial was to commence, the trial court issued a two-page notice to counsel, in which it decreed *sua sponte* that during the already scheduled pretrial hearing set to commence in two days' time, it would hear any oral motions for judgment on the pleadings any defendant wished to advance; it would share its views on the likelihood that certain jury instructions would be given and its views on some arguments advanced by the parties on whether general negligence claims could be advanced; it would hear discussion and issue rulings regarding the necessity of expert testimony, and the effect of that ruling on the viability of claims asserted; it would work with counsel to minimize evidentiary disputes and to organize exhibits and evidence; and it "may, with the assistance of counsel, identify claims or issues susceptible to the conduct of a hearing authorized by *Cottle*[, *supra*,] 3 Cal.App.4th [at page] 1381 . . . that is to determine whether a prima facie case can be established before the start of the trial."

When they appeared for the pretrial hearing on July 24, 2013, the parties presented bench briefs on some of the issues identified in the trial court's notice and asserted their preparedness to discuss others.  Sierra Pacific proceeded to move for judgment on the pleadings as to all of Cal Fire's claims, for failure to state a cause of action.  Before presenting arguments on that motion, Sierra Pacific also stated its intention to move "under *Cottle* for the Court to require a prima facie showing from all plaintiffs on various issues."  Argument on the motion for judgment on the pleadings took the entirety of the

10

morning session that day, with Cal Fire being invited to submit a written opposition to the motion "promptly."

During the afternoon session, defendants identified two "insurmountable" causation issues for all plaintiffs: (1) the fire was reported within the two-hour window after cessation of yarding activity that would trigger inspection requirements under California Code of Regulations, title 14, section 938.8,[10] and Bush was returning to conduct an inspection within that two-hour window but by the time he arrived the fire was already burning uncontrollably; and (2) as it is alleged the fire remained in an "incipient state" for an hour and a half, there is no evidence a diligent inspection would have detected the fire. Additionally, defendants argued there was no evidence that different conduct by any defendant other than Howell, Bush, or Crismon would have changed the outcome on September 3, 2007, to support plaintiffs' claims of negligent supervision, negligent hiring, negligent retention, or negligent maintenance. Defendants also argued there was an absence of evidence of Howell's or Beaty's violation of the standard of care because no plaintiff had offered an expert to testify in that regard and Howell's policies could not be used to establish the standard of care.

Thus, it was not until later in the afternoon session on July 24, 2013, that the issues on which plaintiffs would be called to present a prima facie case were even identified. Counsel for plaintiffs presented argument and offers of proof on the afternoon of July 24. On July 25, counsel for Cal Fire and Howell presented a substantial amount of evidence and argument regarding the causation and standard of care issues highlighted

---

[10] California Code of Regulations, title 14, section 938.8, subdivision (a) provides in relevant part: "The timber operator or his/her agent shall conduct a diligent aerial or ground inspection within the first [two] hours after cessation of felling, yarding, or loading operations each day during the dry period when fire is likely to spread. The person conducting the inspection shall have adequate communication available for prompt reporting of any fire that may be detected. . . ."

11

by counsel for defendants the previous day, and defendants presented counter-arguments and challenged the offers of proof of evidence presented. Toward the end of the day on July 25, the trial court directed defendants to prepare a proposed order laying out the deficiencies in plaintiffs' case to be distributed that night, with an opportunity to cure to be given the following day.

Then, on July 26, 2013, when court reconvened, the parties argued the motion for judgment on the pleadings. It was not until that motion was submitted that plaintiffs were permitted to again present their prima facie case, at which time plaintiffs objected to the *Cottle* procedure as applied in this case, and presented further arguments relating to the *Cottle* "motion." During this time period, the parties also presented briefs to the court on any number of other issues still undecided, including, for example, jury instructions, whether expert testimony was required to establish the standard of care and breach thereof, and the motion for judgment on the pleadings. Late in the afternoon on July 26, the trial court deemed the case submitted and entered an order dismissing the case based on its finding that plaintiffs failed to establish a prima facie case.

   2. <u>Legal background</u>.

*Cottle* involved an action filed by approximately 175 owners and renters of residential property who sued the property developers for personal injuries, emotional distress, and property damage arising from development on a site that was previously used as a depository for hazardous waste and byproducts. (*Cottle*, *supra*, 3 Cal.App.4th at pp. 1371-1372.) During discovery, the plaintiffs responded to an interrogatory asking for a detailed description of the illness they claimed to suffer from exposure to chemical substances by stating generally that they had not yet identified any injuries caused by chemical exposure but reserving the right to assert a claim if more information became available. (*Id.* at p. 1372.)

12

On November 7, 1990, the trial court issued a case management order requiring that each plaintiff file and serve by February 1, 1991, a statement establishing a prima facie claim for personal injury and/or property damage, including details as to exposure, injury, and expert support with regard to any personal injury claim.  (*Cottle*, *supra*, 3 Cal.App.4th at p. 1373.)  The plaintiffs filed their statements on January 7, 1991, in which they stated it was " 'virtually impossible' " to determine the specific chemicals to which they were exposed or when and that none had been diagnosed with an injury directly caused by exposure to any chemical present at or around the development, and that their treating physicians did not have the benefit of knowing they were exposed to toxic chemicals.  (*Ibid.*)  The court set a hearing on March 4, 1991, on a motion to dismiss their claims for failure to make a prima facie showing.  (*Id.* at p. 1374.)  On March 12, 1991, the trial court found the plaintiffs had shown a prima facie case for their emotional distress and property damages claims but not their personal injury claims, and tentatively ordered exclusion of all evidence that plaintiffs suffer any particular physical injury based on exposure to chemicals at the development unless the plaintiffs could demonstrate by May 31, 1991, that viable claims for personal injury existed.  (*Ibid.*)

The plaintiffs submitted supplemental statements on May 31, 1991, including declarations from a toxicologist and two neuropsychologists.  (*Cottle*, *supra*, 3 Cal.App.4th at p. 1375.)  On June 27, 1991, the trial court conducted a hearing to determine whether the supplemental statements established a prima facie showing for personal physical injury.  (*Ibid.*)  The trial court concluded no witness presented any statement or testimony establishing to a reasonable medical probability that any hazardous or toxic substance caused any injury or illness in any plaintiff.  (*Ibid.*)  Accordingly, on July 2, 1991, the trial court entered an order in limine excluding all evidence of personal injury.  (*Ibid.*)

13

In defending the trial court's authority to issue such an order, the Court of Appeal, Second Appellate District, Division Seven, reasoned that courts have "inherent equity, supervisory and administrative powers" derived from the Constitution, in addition to statutory authority to control the proceedings which they oversee. (*Cottle*, *supra*, 3 Cal.App.4th at p. 1377.) Thus, *Cottle* explained, " ' " '[c]ourts have inherent power . . . to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council.' " That inherent power entitles trial courts to exercise reasonable control over all proceedings connected with pending litigation . . . in order to insure the orderly administration of justice.' " (*Id.* at p. 1378.)

Thus, *Cottle* recognized that "courts have the power to fashion a new procedure in a complex litigation case to manage and control the case before them." (*Cottle*, *supra*, 3 Cal.App.4th at p. 1380.) Although *Cottle* did not set forth any precise guidelines, it encouraged consideration of "the totality of the circumstances," and concluded the timing of the order in that case was "crucial to its legitimacy." (*Ibid.*) The exclusion order was issued a month prior to the anticipated start of a one- to two-year-long trial and after discovery was closed. (*Ibid.*) Therefore, *Cottle* approved the trial court's use of its inherent powers to manage complex litigation by ordering exclusion of evidence when the plaintiffs are unable to establish a prima facie case prior to the start of trial. (*Id.* at p. 1381.)

*Cottle* further rejected the plaintiffs' contention that they were deprived of due process, holding, "[e]ven though the nature of the proceedings in the court changed, it was clear that what the court wanted was for petitioners [(the plaintiffs)] to make a prima facie showing of their physical injury claims. Accordingly, [the plaintiffs] had notice of what was actually required of them as well as extensive opportunity to present evidence and argue the issue." (*Cottle*, *supra*, 3 Cal.App.4th at p. 1384.)

14

In the nearly three decades since *Cottle* was decided, two published cases have affirmed a trial court's use of *Cottle*-type proceedings. In *Lockheed Martin Corp. v. Continental Ins. Co.* (2005) 134 Cal.App.4th 187, 193, Lockheed Martin sought coverage under numerous policies for pollution-related liability. The trial court organized the litigation, involving that suit and others, into phases with one phase set to be tried to a jury. (*Id.* at p. 195.) Prior to trial, the trial court (Judge Leslie C. Nichols, who was also the trial judge here) conducted a *Cottle* hearing that "require[ed] the parties to produce evidence to support a prima facie case on every issue for which the party had the burden of proof." (*Lockheed*, at p. 195.) Lockheed Martin submitted evidence, including a series of declarations from employees and experts, of 14 accidents it claimed resulted in the release of pollutants at a specific location. (*Id.* at pp. 211, 213.) When Lockheed Martin failed to prove its claim of coverage for contamination at one location, the trial court excluded evidence leading to dismissal of its indemnity claims. (*Id.* at p. 195.) While no specific timeline is described in *Lockheed*, it is apparent the litigation lasted 10 years and there was ample time provided for the parties to accumulate declarations and other evidence prior to the hearing. (*Id.* at pp. 193, 213-214.)

And, in *Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1243-1245, a case involving several hundred plaintiffs with toxic tort claims, the trial court required offers of proof demonstrating causation to be submitted with an amended complaint to be filed following the sustaining of a demurrer. The reviewing court indicated it had "significant concerns about a procedure requiring detailed sworn affidavits at the pleading stage," but assumed the order was valid because the plaintiffs had not raised any issues challenging it. (*Id.* at p. 1245, fn. 3.)

The infrequent application of *Cottle* is perhaps unsurprising in light of extensive scrutiny of its reasoning. In the dissent to *Cottle*, authored by Justice Johnson, it was highlighted that until *Cottle*, "resort to a trial court's inherent authority to craft new rules

15

of civil procedure [was] only a proper exercise of inherent powers when made necessary because of the *absence* of any statute or rule governing the situation. Thus, the rationale for devising new rules of procedure has historically been one of necessity. In other words, to fill a void in the statutory scheme, a court had a duty to create a new rule of procedure in the interests of justice and in order to exercise its jurisdiction." (*Cottle*, *supra*, 3 Cal.App.4th at p. 1391 (dis. opn. of Johnson, J.).) And none of the prior judicially created procedures involved deciding the merits of a cause of action thereby removing it from a jury's consideration. (*Ibid.*)

Subsequent authority too has challenged the scope of the court's inherent authority relied upon in *Cottle*. *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 967, citing *Cottle,* acknowledged the courts' "fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them," but observed the courts' powers to fashion new procedures is not boundless (*id*. at pp. 967-968). Rather, "inherent power may only be exercised to the extent not inconsistent with the federal or state Constitutions, or California statutory law." (*Stephen Slesinger, Inc. v. Walt Disney Co.* (2007) 155 Cal.App.4th 736, 762 (*Slesinger*); see *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1351-1352; see also *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 296-300 [vacating trial court's order requiring statements from plaintiffs demonstrating prima facie showing of causation because it required early and unilateral disclosure of expert witness information rather than the mutual and simultaneous disclosure contemplated by the discovery statutes]; *First State Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 324, 330, 333-336 [rejecting trial court's case management order because it required resolution of choice of law before any dispositive motion could be filed, which conflicts with statutes authorizing filing of motions for summary judgment or summary adjudication].) Thus, "[a]lthough broad in scope, this inherent power to fashion novel procedures is not unlimited. A court cannot adopt an

16

innovative rule or procedure without carefully weighing its impact on the constitutional rights of the litigants." (*In re Amber S.* (1993) 15 Cal.App.4th 1260, 1264-1265.)

So too has the use of other motions in limine to hear disguised dispositive motions been criticized. For example, a court may employ its inherent powers, including the " 'inherent power to control litigation and conserve judicial resources,' " to use a motion in limine to test whether a complaint states a cause of action. (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 951; see *Lucas v. County of Los Angeles* (1996) 47 Cal.App.4th 277, 284-285.) However, in limine motions are designed to prevent admission of evidence where it would be impossible to " ' "unring the bell" ' " if the evidence is presented to the jury, not to replace statutorily prescribed dispositive motions. (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593.) Nonetheless, trial courts have used motions in limine to dismiss a cause on the pleadings, to examine the sufficiency of the evidence, or to require a party to make an offer of proof tantamount to an opening statement, which in effect amounts to a demurrer to the evidence or motion for nonsuit. (*Id.* at pp. 1593-1594; see *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 701-702.) Reviewing courts are "becoming increasingly wary of this tactic" in large part because the procedural shortcuts "circumvent procedural protections provided by the statutory motions or by trial on the merits; . . . risk blindsiding the nonmoving party; and, in some cases, . . . could infringe a litigant's right to a jury trial." (*Amtower*, *supra*, at p. 1594.)

Concerns about procedural shortcuts may also implicate constitutional issues. "Both the federal and state Constitutions compel the government to afford persons due process before depriving them of any property interest. (U.S. Const., 14th Amend. ['nor shall any state deprive any person of life, liberty, or property, without due process of law']; Cal. Const., art. I, § 7, subd. (a) ['A person may not be deprived of life, liberty, or property without due process of law . . . .'].)" (*Today's Fresh Start, Inc. v. Los Angeles*

17

*County Office of Education* (2013) 57 Cal.4th 197, 212 (*Today's Fresh Start*).) This requires that a party at risk of loss be given notice and an opportunity to be heard, " 'at a meaningful time and in a meaningful manner.' " (*Ibid.*) This is a flexible requirement, varying with the circumstances of any given case. (*Id.* at pp. 212-213.) The function of the legal process afforded by these constitutional mandates is to minimize the risk of erroneous decisions. (*Id.* at p. 212.) And, if due process was not afforded before an order depriving the party of his or her interest was entered, we must reverse the order. (*Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1550.)

    3.    <u>Analysis</u>.

In determining whether due process was afforded here, we adopt the balancing test set forth in *Mathews v. Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 33]. (*Today's Fresh Start*, *supra*, 57 Cal.4th at p. 213.) This requires us to consider, " 'first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, third, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " (*Ibid.*)

That there is a private interest affected here is of little doubt. "Due process requires notice before a dismissal of a case may be entered." (*Lee v. Placer Title Co.* (1994 ) 28 Cal.App.4th 503, 510; see *Cordova v. Vons Grocery Co.* (1987) 196 Cal.App.3d 1526, 1531; see also *Wilson v. Sunshine Meat & Liquor Co.* (1983) 34 Cal.3d 554, 561, fn. 7.) For, if a plaintiff's case is dismissed without due process, that party's right of access to the courts is infringed. (See generally *Payne v. Superior Court* (1976) 17 Cal.3d 908, 914.) Having established that a right requiring procedural due process protections is implicated, we consider the remaining factors.

The risk of an erroneous deprivation was high as a result of the procedures implemented in this case. Plaintiffs were not provided advance notice of the issues they would be asked to address at the hearing, which resulted in a dismissal of their entire actions. Rather, they were notified by the trial court two days before the hearing, and one week before a multi-month trial was to commence, that it "may" identify issues, with the aid of counsel, on which to conduct a *Cottle* hearing. However, *Cottle* and the cases that have implemented it provided parties weeks or months to collect information to present a prima facie case on a select and enumerated issue, and then provided the presenting party an opportunity to cure any perceived deficiencies in that presentation. None of that was provided here. While also arguing a motion for judgment on the pleadings, and jury instructions, plaintiffs were required on a half-day's notice to present a prima facie case on causation and on standard of care, without being given an adequate or meaningful opportunity to contact their witnesses or to gather the required information, even from the extensive discovery that had already been completed. Had the trial court identified the issues it perceived deficient upon reading the trial briefs or even in the notice to counsel, it could have continued trial to provide plaintiffs an adequate opportunity to present their prima facie case and to cure any deficiencies. Without doing so, plaintiffs did not have the requisite meaningful notice and opportunity to avoid dismissal of their entire case.

The only identifiable governmental interest impacted by the provision of additional procedural protections, i.e., advance notice of the issues to be presented and a meaningful opportunity to gather evidence to present, are the fiscal and administrative burden of conducting trial as scheduled. However, this too could have been ameliorated had the trial court identified the issues for which it required a prima facie presentation immediately following its review of the trial briefs—apparently the precipitating force behind its decision to utilize *Cottle* to narrow the issues of the case—two full weeks before trial was to commence. For example, the trial court could have continued trial at

that point, which would have permitted the court to contact jurors and to adjust the courthouse schedule to allow time for the *Cottle* hearing to be noticed and heard, with an opportunity to cure any deficiencies before an order was entered. Additionally, this interest is minor in contrast to the potential for erroneous dismissal of the entire case through the procedures implemented.

Balancing these factors, on the facts before us, we conclude plaintiffs' due process rights were infringed by the manner in which the trial court noticed and conducted the *Cottle* hearing. Accordingly, we reverse the judgment of dismissal premised on the trial court's July 26, 2013 order finding plaintiffs failed to establish a prima facie case.

**B.      *Judgment on the Pleadings***

As noted above, during the pretrial hearing less than a week before trial was to commence, Sierra Pacific made an oral motion for judgment on the pleadings as to the claims presented by Cal Fire.[11] The gist of the motion was that sections 13009 and 13009.1, on which Cal Fire's claims were necessarily premised,[12] limited recovery for direct liability and did not incorporate common law theories of negligence. Cal Fire disagreed, arguing use of the word "negligently" in section 13009 incorporates common law theories of negligence into permissible grounds for recovery of fire suppression and investigation costs. The trial court granted judgment on the pleadings to defendants

---

[11] Beaty and landowner defendants also joined in the motion, and Sierra Pacific argued it was applicable to all defendants excepting Howell, Crismon and Bush.

[12] In its complaint, Cal Fire sought to recover its fire suppression costs under sections 13009 and 13009.1. To that end, it alleged that all defendants violated California Code of Regulations, title 14, section 938.8 (requiring inspection following certain timber operations) and were negligent in starting the Moonlight Fire and allowing it to spread; additionally, against Beaty and the landowner defendants, it alleged negligent management and use of land; against Sierra Pacific, Beaty, the landowner defendants, and Howell, it also alleged negligent supervision and inspection; and against Sierra Pacific alone it alleged negligence based on a peculiar risk.

20

Sierra Pacific, Beaty, and landowner defendants (leaving only Cal Fire's claims against Howell, Bush, and Crismon). Cal Fire now appeals that order, claiming use of the word "negligently" in the statute incorporates common law theories of negligence, including vicarious liability, and that the inclusion of a corporation as a " '[p]erson' " in section 19 requires the same conclusion. We conclude the trial court did not err in awarding judgment on the pleadings.

In construing sections 13009 and 13009.1, we extend no deference to the trial court's interpretation, but instead review the question of law regarding statutory construction de novo. (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.) " 'Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent.' " (*Id.* at pp. 95-96.) We construe the language in the context of the entire statutory framework, with consideration given to the policies and purposes of the statute. (*Jones v. Superior Court* (2016) 246 Cal.App.4th 390, 397.) In so construing the statute, we may not "insert what has been omitted, or . . . omit what has been inserted." (Code Civ. Proc., § 1858.) We also recognize that " ' "where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes." ' " (*Los Angeles County Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1108 (*Alameda Produce*).)

At common law, there was no recovery of government-provided fire suppression costs; that recovery is purely a creature of statute. (*City of Los Angeles v. Shpegel-Dimsey, Inc.* (1988) 198 Cal.App.3d 1009, 1020 (*Shpegel-Dimsey*).) A governmental decision to provide tax-supported services, such as police or fire responses to emergencies, is a legislative policy determination. (*Id.* at p. 1018.) Thus, " 'in the

21

absence of a statute expressly authorizing recovery of public expenditures [(i.e., police, fire and other emergency services)], "the cost of public services for protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service." ' " (*Ibid.*) Therefore, Cal Fire's ability to recover its fire suppression costs is strictly limited to the recovery afforded by statute.

The statutes in question here, sections 13009 and 13009.1, provide as follows. In pertinent part, section 13009, subdivision (a) states that "[a]ny person . . . who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape onto any public or private property . . . is liable for the fire suppression costs incurred in fighting the fire and for the cost of providing rescue or emergency medical services, and those costs shall be a charge against that person. . . ." Section 13009.1 states that "[a]ny person . . . who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape onto any public or private property . . . is liable for both of the following: [¶] (1) [t]he cost of investigating and making any reports with respect to the fire[;] [and] [¶] (2) [t]he costs relating to accounting for that fire and the collection of any funds pursuant to Section 13009, including, but not limited to, the administrative costs of operating a fire suppression cost recovery program. . . ." (§ 13009.1, subd. (a).) A "person" for purposes of these statutes is "any person, firm, association, organization, partnership, business trust, corporation, limited liability company, or company." (§ 19.)

As the language of the statute itself does not clearly delineate the impact of the inclusion of the term "negligently," we turn to legislative history for guidance. In 1931, the Legislature enacted chapter 790, which provided that an owner whose property was damaged could recover from "[a]ny person who: [¶] (1) [*p*]*ersonally or through another*, and (2) [w]ilfully, negligently, or in violation of law, commits any of the

22

following acts:  (1) [s]ets fire to, (2) [a]llows fire to be set to, (3) [a]llows a fire kindled or attended by him to escape to the property, whether privately or public owned, of another" or "[a]ny person" who allowed a fire burning on his property to escape to another's property "without exercising due diligence to control such fire."  (Stats. 1931, ch. 790, §§ 1-2, p. 1644, italics added.)  Chapter 790 also permitted recovery of the expenses of fighting such fires "by the party, or by the federal, state, county, or private agency incurring such expenses."  (Stats. 1931, ch. 790, § 3, p. 1644.)  Prior to this enactment, there was no statute authorizing the government to recover its fire suppression or investigation costs.

In 1953, the Legislature enacted chapter 48, codifying section 13007 et seq., including, in particular, section 13009, which *generally* appears to replicate the language of the 1931 enactment.  (Stats. 1953, ch. 48, §§ 1-3, p. 682.)  As enacted, former section 13009 permitted recovery of "[t]he expenses of fighting any fires mentioned in Sections 13007 and 13008 . . . against any person made liable by those sections for damages caused by such fires."  (Stats. 1953, ch. 48, § 3, p. 682.)  At that time, section 13007 permitted an owner whose property was damaged to recover against "[a]ny person who *personally or through another* wilfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another, whether privately or publicly owned . . . ."  (Stats. 1953, ch. 48, § 1, p. 682, italics added.)[13]  Section 13008 made liable "[a]ny person" who allowed a fire

_____

[13] Though section 19, which provides the statutory definition of "person," had not been enacted when the initial statute providing for recovery of fire suppression costs came into effect in 1931, it was enacted prior to this 1953 enactment of former sections 13007, 13008, and 13009.  (See Stats. 1939, ch. 60, gen. prov. 19, pp. 483-484, amended by Stats. 1994, ch 1010, § 151, p. 6095 [adding "limited liability company" to the statutory definition of "person"].)  At that time, it included, as it does today, "corporation" as a person.  (Stats. 1939, ch. 60, gen. prov. 19, p. 484.)  The Legislature was presumptively aware of this when it enacted section 13009 in 1953.  (*People v. Scott* (2014) 58 Cal.4th

burning on his property to escape to another's property "without exercising due diligence to control such fire." (Stats. 1953, ch. 48, § 2, p. 682.) Thus, through reference by incorporation to section 13007, former section 13009 allowed for recovery against a person who acted "personally or through another." (Stats. 1953, ch. 48, §§ 1, 3, p. 682.)

Then, in 1971, apparently in reaction to the decision in *People v. Williams* (1963) 222 Cal.App.2d 152, in which the State was deemed unable to recover its fire suppression costs against a defendant who set a fire that burned out of control within the boundaries of his own property, the Legislature amended section 13009. (*People v. Southern Pacific Co.* (1983) 139 Cal.App.3d 627, 637 (*Southern Pacific*).) As amended, former section 13009 read, in pertinent part: "Any person who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him to escape onto any forest, range or nonresidential grass-covered land is liable for the expense of fighting the fire and such expense shall be a charge against that person." (Stats. 1971, ch. 1202, § 1, p. 2297.) As relevant to our present inquiry, while the 1971 amendment addressed the boundary limitation identified in *Williams*, the amendment also removed the reference by incorporation to section 13007's language imposing liability on any person who acted "personally or through another." (Compare Stats. 1953, ch. 48, § 1, p. 682 with Stats. 1971, ch. 1202, § 1, p. 2297.)

None of the subsequent amendments to section 13009 in 1982, 1987, 1992, or 1994 have re-inserted or otherwise incorporated the "personally or through another" language that would expressly provide for the application of vicarious liability concepts. (Cf. Stats. 1982, ch. 668, § 1, p. 2738; Stats. 1987, ch. 1127, §1, p. 3846; Stats. 1992, ch. 427, § 91, pp. 1627-1628; Stats. 1994, ch. 444, § 1, pp. 2410-2411.) Neither did the Legislature include such language in section 13009.1, when it was added in 1984 or

1415, 1424 [ "the Legislature ' "is deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof." ' ")

24

amended in 1987. (§ 13009.1, added by Stats. 1984, ch. 1445, § 1, pp. 5058-5059, as amended by Stats. 1987, ch. 1127, § 2, pp. 3846-3847.) Instead, as relevant to our inquiry, both sections 13009 and 13009.1 persist in imposing liability on "[a]ny person . . . who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape onto any public or private property . . . ." (§§ 13009, subd. (a); 13009.1, subd. (a).) In contrast, section 13007 remains as it was codified in 1953 and still permits liability to be imposed on "[A]ny person who *personally or through another* wilfully, negligently, or in violation of law, sets fire to, allows fire to be set to, or allows a fire kindled or attended by him to escape to, the property of another . . . ." (§ 13007, italics added.)

Cal Fire argues we should not construe the presence of the "personally or through another" language in section 13007 and its absence in sections 13009 and 13009.1 as indicative of any legislative intent to preclude application of vicarious liability concepts in the latter sections. We disagree. Cal Fire's claim that the language is surplusage in section 13007 is unavailing. For, "[i]t is a maxim of statutory interpretation that courts should give meaning to every word of a statute and should avoid constructions that would render any word or provision surplusage." (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1038.) Moreover, the presence of the language in section 13007, a similar statute on a related subject, and its omission from sections 13009 and 13009.1 is significant in ascertaining legislative intent from the statutes' language. (*Alameda Produce*, *supra*, 52 Cal.4th at p. 1108.) Nor do we find it incongruous that the Legislature may have afforded a longer reach in recovery efforts to an owner whose property was damaged than it afforded those who expended funds fighting or investigating the fire. Therefore, based on the plain language of the statute, when read in the context of the statutory framework as a whole, we conclude the

25

Legislature did not incorporate concepts of vicarious liability into sections 13009 or 13009.1.

We also reject Cal Fire's contention that other common law theories of direct liability including negligent supervision, negligent hiring, negligent inspection, negligent management and use of property, and peculiar risk have been grafted into sections 13009 and 13009.1 through inclusion of the term "negligently." The adverb "negligently" carries the connotation that the tortious actor " 'failed to comply with a standard of conduct with which any ordinary reasonable man *could* and *would* have complied: a standard requiring him to take precautions against harm.' " (Black's Law Dict. (10th ed. 2009) p. 1198, col. 2.) Here, "negligently" is an adverb modifying three potential verb phrases: (1) sets a fire, (2) allows a fire to be set, or (3) allows a fire kindled or attended by him or her to escape. (§§ 13009, subd. (a), 13009.1, subd. (a).) To read the statute as permitting liability where a "person" negligently supervised, managed, hired, or inspected another who set or allowed to be set a fire, is simply too attenuated a construction to be plausible. Moreover, Cal Fire has not cited for this court any published case that has imposed liability under such circumstances, and we have not found any such cases.

The most apropos potential case we encountered was *County of Ventura v. Southern California Edison Co.* (1948) 85 Cal.App.2d 529. There, a power company was found to be liable to the county and fire protection district for costs of fighting a fire that occurred when a power line came into contact with a telephone line and pole, all of which were owned by the power company, as a result of the power company's negligent construction and maintenance of its lines. (*Id.* at p. 531.) The power company argued the statute in effect, which imposed liability for the expense of fighting fires on "[a]ny person who: (1) [*p*]*ersonally or through another*, and (2) [w]ilfully, negligently, or in violation of law, . . . (1) [s]ets fire to, (2) [a]llows fire to be set to, [or] (3) [a]llows a fire kindled or

26

attended by him to escape to the property . . . of another . . . ," did not provide a basis for liability against the power company. (*Id.* at pp. 531-532, italics added.) The Court of Appeal disagreed, finding that while liability perhaps could not be found based on the first prong—sets fire to—without there being some direct act, liability could be premised based on the second prong—allows fire to be set to—where the allegedly negligent actor could "be charged with knowledge of the condition of its equipment, [and] took no steps to prevent the occurrence of fire, which was the reasonably foreseeable consequence of that condition." (*Southern California Edison,* at pp. 532-533.) However, liability in that case was not based on section 13009 in its present form, but on a former statute that allowed recovery against a person who acted "personally or through another," and still imposed liability not on a third party with some responsibility to supervise or oversee the actor, but on the actor itself that failed to properly maintain its own equipment that directly caused the fire. It is, therefore, unavailing to extend liability in this case to defendant landowners, the property manager (Beaty), or timber purchaser (Sierra Pacific).

We are not persuaded otherwise by the cases cited by our esteemed colleague in his dissent or by the cases proffered by Cal Fire. For instance, as the dissent acknowledges, *Haverstick v. Southern Pacific Co.* (1934) 1 Cal.App.2d 605, though it affirms a judgment in favor of the plaintiff landowner for property damage and personal injuries against the railroad for the negligence of its employees, the opinion does not make clear or indeed even mention which section of chapter 790 was the basis of the plaintiff's claim for damages. (Dis. opn., *post*, at pp. 2-3.) It is axiomatic that cases are not authority for propositions not considered therein (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 437, fn. 11), and here, because it is not articulated in the opinion, we cannot say whether *Haverstick* is interpreting the section of chapter 790 that premised liability on direct actions of a person

27

or actions engaged in personally or through another. *People ex rel. Grijalva v. Superior Court* (2008) 159 Cal.App.4th 1072 did not have to address whether there was legal responsibility for a fire because the real parties in interest admitted responsibility (*id.* at p. 1075); indeed, it focused on whether the affirmative defenses of comparative fault or failure to mitigate damages could be raised against the government in light of its immunity (*id.* at pp. 1077-1079). And, *People v. Southern Cal. Edison Co.* (1976) 56 Cal.App.3d 593, 596 concerned only whether it was error to award a new trial based on a particular declaration of counsel purporting to establish a claim of juror misconduct, and whether it was error to instruct the jury on the amount of firefighting expenses incurred by the State in fighting a particular fire. *Southern Pacific*, *supra*, 139 Cal.App.3d 627 involved a fire that started on railroad property and spread to surrounding property. The pertinent question presented to the court in *Southern Pacific* was whether a jury instruction that permitted liability for fire suppression costs based on the defendant's failing to extinguish a fire that it was not found to have kindled was erroneous. (*Id.* at pp. 636-637.) *Southern Pacific* concluded that because section 13009 did not incorporate the language of section 13008, the instruction was erroneous. (*Southern Pacific*, at p. 638.) It, however, found the error harmless because there was substantial evidence the fire was likely to have been caused by sparks or particles emitted by trains. (*Id.* at pp. 638-639.) In its interpretation of former section 13009, *Shpegel-Dimsey*, *supra*, 198 Cal.App.3d at pages 1019 through 1020 held only that the City could not recover fire suppression costs because the defendant was not one of the classes of persons held liable and the City's property was not one of the classes of property protected by the statute as it existed at the time of the fire in 1980.

Moreover, subdivisions (a)(2) and (3), added to sections 13009 and 13009.1 in 1987, extended liability for cost recovery to "[a]ny person . . . (2) other than a mortgagee, who, being in actual possession of a structure, fails or refuses to correct, within the time

28

allotted for correction, despite having the right to do so, a fire hazard prohibited by law, for which a public agency properly has issued a notice of violation respecting the hazard, or (3) including a mortgagee, who, having an obligation under other provisions of law to correct a fire hazard prohibited by law, for which a public agency has properly issued a notice of violation respecting the hazard, fails or refuses to correct the hazard within the time allotted for correction, despite having the right to do so . . . ." (Stats. 1987, ch. 1127, §§ 1-2, pp. 3846-3847.) Were it possible for section 13009 or 13009.1 to be applied to one who did not through his direct action proximately cause the fire, i.e., to set a fire or allow it to be set, there would have been no cause to amend the statute to extend liability to one who has the right and responsibility to cure a noticed fire hazard but fails to do so. That person, whether he or she is in actual possession as owner, lessor, lessee, mortgagor, or mortgagee, would have been liable for his or her negligent use and management of the property under the "allows a fire to be set" prong of subdivision (a)(1) of sections 13009 and 13009.1. We will not read sections 13009 and 13009.1 in such a way as to make inclusion of subdivisions (a)(2) or (3) of sections 13009 or 13009.1 nugatory. (*Harris v. Superior Court* (2011) 53 Cal.4th 170, 188 [we avoid statutory interpretations that "render part of an enactment nugatory"].)

Therefore, we conclude neither that inclusion of the term "negligently" in sections 13009 and 13009.1 nor that the statutory definition of "person" to include a corporation, incorporates common law theories of negligence into the statutes. And further that sections 13009 or 13009.1 do not provide for vicarious liability. Accordingly, the trial court did not err in awarding judgment on the pleadings to Sierra Pacific, Beaty, and landowner defendants with regard to Cal Fire's claims. On remand following our reversal of the judgment of dismissal premised on the trial court's July 26, 2013 order finding plaintiffs failed to establish a prima facie case (see pt. I.A.3., *ante*, at pp. 18-20), Cal Fire is barred from pursuing claims against any defendant based on common law

29

theories of negligence that have not been expressly included in sections 13009 or 13009.1.  In reality, for reasons discussed in unpublished part II.B.4. of this opinion, *post*, we suspect it is unlikely there will be any opportunity on remand for Cal Fire to pursue claims against any defendant.  [END OF FULLY PUBLISHED PT. I.]

## II.  Challenges to Postjudgment Awards[*]

Plaintiffs also challenge the trial court's postjudgment awards, specifically the orders awarding costs to defendants as prevailing parties and the orders mandating Cal Fire to pay attorney fees and expert fees and expenses to defendants either as prevailing party awards or as discovery sanctions.  Cal Fire also challenges any order awarding costs of proof based on disproving denials to requests for admission.  We conclude any order for costs as prevailing parties premised on the *Cottle* proceeding are necessarily vacated, and because the trial court did not apportion costs, the order awarding costs based on the judgment on the pleadings is remanded for further proceedings.  As to discovery sanctions, we conclude it was not error for the trial court to impose monetary and terminating sanctions, but the manner in which it imposed monetary sanctions was an abuse of discretion.  Therefore, we remand for further proceedings to determine an appropriate sanction award.  However, we conclude it was error for the trial court to award attorney fees to defendants as prevailing parties against Cal Fire.  Finally, there is no order awarding costs of proof for us to review on appeal.

### A.    *Costs*

The trial court entered three separate orders awarding costs.  To Beaty and landowner defendants, the trial court awarded costs in the sum of $583,173.15.  To Sierra Pacific, it entered an award of costs in the sum of $2,852,209.34.  And, to defendants Howell, Bush, and Crismon, the trial court awarded costs in the sum of $417,604.06.  The

---

[*]  See footnote, *ante*, page 1.

trial court did not apportion the costs awards among the multiple plaintiffs but instead made each plaintiff jointly and severally liable for the entire amount of each costs award.

In light of our reversal of the trial court's judgment of dismissal premised on its finding that plaintiffs had failed to establish a prima facie case (the *Cottle* proceeding), its postjudgment order awarding costs to defendants as prevailing parties is necessarily vacated. (*Ducoing Management, Inc. v. Superior Court* (2015) 234 Cal.App.4th 306, 314 ["A disposition that reverses a judgment automatically vacates the costs award in the underlying judgment even without an express statement to this effect."].) However, as discussed above, the trial court properly awarded judgment on the pleadings to defendants Sierra Pacific, Beaty, and landowner defendants and against plaintiff Cal Fire. Therefore, an award of costs to defendants Sierra Pacific, Beaty, and landowner defendants as prevailing parties against Cal Fire is appropriate. Nonetheless, because the trial court's orders awarding costs did not differentiate between costs incurred by defendants in response to Cal Fire's action as opposed to other plaintiffs' actions, we are unable to ascertain which costs, if any, were properly awarded to Sierra Pacific, Beaty, and landowner defendants as prevailing parties against Cal Fire. On remand, the trial court may award statutorily allowable costs to Sierra Pacific, Beaty, and landowner defendants to the extent these defendants incurred costs defending against Cal Fire's action. (Code Civ. Proc., §§ 1032, 1033.5.)

## B.     *Discovery Sanctions*

The trial court entered postjudgment discovery sanctions against Cal Fire including both monetary sanctions totaling $28,765,365.89 and terminating sanctions based on its finding that Cal Fire had engaged in pervasive and gross discovery abuses. The trial court awarded to Beaty and landowner defendants the sum of $6,146,901.41 (comprised of attorney fees and expert witness fees), as an alternative to an award of attorney fees, as a prevailing party. The trial court awarded cumulatively to Howell,

31

Bush, and Crismon, as an alternative to a prevailing party attorney fee award, the sum of $1,571,741.28 (comprised of attorney fees and expert witness fees adjusted by a lodestar factor of 1.2). Finally, it awarded to Sierra Pacific sanctions of $21,100,723.20 (comprised of attorney fees and expert witness fees, costs, and expenses adjusted by a lodestar factor of 1.2), again as an alternative to an attorney fee award.[14]

On appeal, Cal Fire argues the trial court did not have jurisdiction to impose terminating sanctions, that the terminating sanctions imposed were improperly punitive and not factually supported, and that monetary sanctions were improper because the trial court did not make the requisite findings required by Code of Civil Procedure section 2023.030. We conclude the trial court had jurisdiction to enter terminating and monetary sanctions and it did not err in imposing terminating sanctions. However, the manner in which it imposed monetary sanctions was an abuse of discretion.

1.    Additional background.

In awarding discovery sanctions, the trial court found that beginning in July 2010 and continuing through 2013, Cal Fire committed multiple acts that amounted to a "gross abuse" of the Civil Discovery Act. Specifically, the trial court found that Cal Fire investigator Joshua White engaged in spoliation when he destroyed his field notes; he also created a false "Origin and Cause Investigation Report" (the Moonlight report), the false narrative of which was injected in the litigation in July 2010 when Cal Fire provided the Moonlight report—in lieu of factual statements—in its response to interrogatories; and White continued the same false narrative by testifying untruthfully at his deposition

---

[14] This amount does not include the award of $650,634 adjusted by a 1.2 lodestar (for a total of $780,760.80) ordered by the trial court to Sierra Pacific as fees incurred in making its motion for fees, expenses, and/or sanctions. Thus, though the total amount the trial court ordered Cal Fire to pay to Sierra Pacific in its order awarding fees, expenses, and/or sanctions was $21,881,484, the total amount of sanctions and prevailing party attorney fees awarded was $21,100,723.20.

32

in November 2010. Thus, the trial court concluded monetary sanctions as a result of discovery abuses began accruing in July 2010 in the form of all defense expenses incurred from that point forward, including all attorney fees. Moreover, the trial court concluded, "[a]ll of Defendants' defense expenses are, in one way or another, inextricably intertwined with the falsehoods and omissions in the Origin and Cause [Investigation] Report."

In addition to monetary sanctions, the trial court found terminating sanctions were appropriate because "Cal Fire and its counsel engaged in a stratagem of obfuscation that infected virtually every aspect of discovery in this case." The trial court noted that the pattern and practice of obfuscation began during discovery and continued even after the trial court had entered judgment and found Cal Fire's " 'willful,' " "repeated and egregious" discovery abuses impaired defendants' rights and " 'threatened the integrity of the judicial process.' " The trial court also found that less severe sanctions would be unworkable and ineffectual because Cal Fire's discovery abuses had "permeated nearly every single significant issue in this case."

The trial court found that "Cal Fire's actions initiating, maintaining, and prosecuting this action, to the present time [(postjudgment)], [are] corrupt and tainted. Cal Fire failed to comply with discovery obligations, and its repeated failure was willful." In concluding discovery sanctions were appropriate, the trial court stated, "In the end, Cal Fire and its counsels' vast array of discovery abuses suggests that they perceive themselves as above the rule of law. With their abuses infecting virtually every aspect of the discovery process, from false testimony, to pervasive false interrogatory responses, to spoliation of critical evidence, to willful violations of the Court's Orders requiring production of WiFITER [(Wildland Fire Investigation Training and Equipment Fund)] documents, Defendants and the Court simply have no reason to believe that these Defendants can receive, or could ever have received, a fair trial under these

33

circumstances." In ordering terminating sanctions, the trial court relied on authority provided by Code of Civil Procedure section 2023.030 in addition to a separate line of case law, "as augmented by the inherent powers of the Court," to issue the "most severe sanction" to dismiss the case with prejudice because it found Cal Fire "engaged in misconduct . . . that is deliberate, that is egregious, and that renders any remedy short of dismissal inadequate to preserve the fairness of the trial."[15]

In reaching these conclusions, the trial court highlighted multiple exemplar discovery abuses it found were committed by Cal Fire.

### a. *WiFITER fund documents*

Cal Fire was ordered by the trial court to produce all responsive documents relating to the "Wildland Fire Investigation Training and Equipment Fund" (the WiFITER fund) by April 30, 2013.[16] At that time it produced 7,206 responsive documents amounting to 27,915 pages. During argument of the motions in limine a couple months later, Cal Fire argued any evidence concerning the WiFITER fund should be excluded at trial as irrelevant because defendants could not point to anything in the discovery they had received that demonstrated the WiFITER fund was improper or

---

[15] Contrary to Cal Fire's claim, we do not believe the trial court's rulings on discovery sanctions are an improper decision on the merits of the case depriving Cal Fire of its right to a jury trial. Rather, the trial court is required to consider the evidence presented to determine whether a misuse of the discovery process has occurred. Here, the claimed misuses included false testimony by a witness and false discovery responses. Thus, the trial court was obliged, upon receiving defendants' motions for sanctions, to consider and weigh the evidence presented to it to make a determination on the merits of the claims of discovery abuse.

[16] WiFITER was a fund established without statutory authorization by Cal Fire and managed by the California District Attorneys Association. The fund, which was established to promote fire investigations and improve training, collected more than $3.6 million dollars through civil cost recovery negotiated settlements before it was closed in April of 2013 following a report from the State Auditor.

illegal, or that it provided any incentive for Cal Fire to conduct its fire investigations for any purpose other than to discover the truth. Based on Cal Fire's representations and argument, and the evidence known to defendants at that time, the trial court granted Cal Fire's motion in limine to exclude any reference to the WiFITER fund.

Then, on October 21, 2013, counsel for Sierra Pacific informed counsel for Cal Fire that it had learned from an independent source (a State Auditor's report issued Oct. 15, 2013) of a responsive document that had not been produced by Cal Fire. As subsequently ordered by the trial court, on October 31, 2013, Cal Fire produced "a jumbled mix of documents"—more than 5,000 pages—that ought to have been produced by the April 30, 2013 deadline. Thereafter, on November 22, 2013, after Cal Fire had represented to the trial court that it had produced "everything," Cal Fire produced an additional 2,000 pages of documentation, in violation of the trial court's first and second orders to produce responsive documents.

The Attorney General presented various theories why the documents were not timely produced, notably, error by Attorney General staff in inadvertently failing to mark pages for production or in inadvertently skipping clumps of pages in their review or software errors in marking pages for production during Attorney General staff review. Nonetheless, the trial court found that Cal Fire's belated production had violated discovery rules and had prejudiced defendants in their ability to adequately conduct depositions, argue, and support or oppose motions, strategize their case, and engage in settlement negotiations because they were lacking relevant information. The trial court also found it would have ruled differently on the aforementioned motion in limine if the information had been disclosed timely and that "some of these [belatedly produced] documents belie Cal Fire's own representations to this Court that there was no evidence whatsoever that the WiFITER fund was improper." The trial court concluded Cal Fire's failure to produce a large volume of relevant documents in violation of the trial court's

35

repeated orders to do so, even if inadvertent, demonstrated a lack of seriousness on behalf of Cal Fire in fulfilling its obligation to comply with the discovery rules that amounted to a gross violation of the rules and an affront to the trial court.

        b.     *Lead investigator's deposition testimony*

The trial court noted there was a "significant dispute between the parties as to whether the investigators properly met the standard of care associated with wildland fire origin and cause investigations," and noted that it was not the trial court's role in this context to resolve this dispute. Nonetheless, in the context of determining whether discovery sanctions should be imposed, the trial court was bound to consider "whether Cal Fire abused the legal process through the false testimony of its lead investigator on the Moonlight Fire, Joshua White." White and the United States Forest Service investigator, Dave Reynolds, who conducted the joint origin and cause investigation together, were the primary scene investigators. They began processing the scene on September 4, 2007, and identified two points of origin the following morning and labeled those points as E-2 and E-3 in the Moonlight report. When asked why White did not mark the E-2 or E-3 points with a white flag (which is indicated by the Moonlight report as a marker for either evidence or a point of origin), take any photographs to document those sites as points of origin, or otherwise document the "most important points in his investigation" until three days later, White provided no explanation and merely responded, "I don't know." Neither could Reynolds explain why there were five photographs, produced in discovery but not attached to the Moonlight report, taken the morning of September 5, 2007, from two selected reference points that seem to center on a white flag, or why the only GPS measurement taken was from the rock directly adjacent to that white flag.

White was able to explain the purpose of the blue, red, and yellow indicator flags seen in the photographs, but denied even seeing the white flag, which the trial court

36

acknowledged was more readily seen when viewed enlarged on a computer screen. After being shown the image in that manner, White retracted his assertion that there was no white flag but continued to profess ignorance of how the flag came to be there. He persisted in denying that he placed the flag, could not explain why it was there, and also maintained he was unaware that Reynolds had placed any white flag for any reason. Neither White nor Reynolds recalled placing any white flags to mark evidence or points of origin, though Reynolds posited the white flag was "very likely . . . a flag [he] put down but . . . discounted . . . later." Additionally, the trial court found that none of the photographs omitted from the Moonlight report demonstrates any interest in points E-2 and E-3, which White identified in the report as the points of origin.

White also disavowed knowledge of a "Fire Origin" sketch—prepared by Reynolds—which depicts the two reference points that coincide with the reference points of the omitted photographs, and distance and bearing measurements from those reference points that intersect at a labeled point of origin marked with an "x" in the same location as the white flag depicted in the omitted photographs, even though photos indicate White would have at least seen the sketch when he took photographs of metal fragments. In another matter, White had testified that to locate a point of origin, one would establish two reference points and take measurements, and that this would be " 'the very foundation of an origin and cause report.' " (Italics omitted.) Nonetheless, here White testified he did not know where the measurements denoted on the sketch intersected, denied having seen the sketch until after the Moonlight report was complete, and indicated he did not learn of the sketch until sometime in 2008.

The trial court explained that White's testimony on the "most central issues" in the case was not credible, demonstrated Cal Fire's pattern of obfuscation and bad faith denial of the truth during discovery, and greatly increased the expense of litigation because "[h]ad [the investigators] testified truthfully from the start, as required, [fn. omitted]

37

Defendants would have likely spent nothing, or very little, as the case most likely could not have advanced." The trial court also castigated Cal Fire's lead counsel for failing to intervene to stop its witnesses from testifying untruthfully. Specifically, Reynolds had discussed whether there was a white flag in a photograph during a meeting with counsel but later denied seeing the flag in the photo when placed under oath in his deposition. The trial court was similarly insulted by Cal Fire's willingness to present a declaration from White even after the case was dismissed wherein he continued to advance his "absurd[]" deposition testimony regarding the white flag.

    c.  *Falsification of interview statements*

     (i)  <u>J.W. Bush interview</u>

White and Reynolds interviewed Bush, a Howell employee working on the day the Moonlight Fire began, on two occasions. The first interview, conducted September 3, 2007, was summarized but was not recorded. The second interview, on September 10, 2007, was both recorded and summarized. The summaries were incorporated into the Moonlight report, which was provided in lieu of a narrative in discovery responses, and the tape-recording of the second interview was provided in discovery.

In his summary of the September 3, 2007 Bush interview, Reynolds claims Bush attributed the cause of the fire to a Caterpillar bulldozer's tracks scraping rock. However, in the September 10, 2007 interview, as revealed by a transcript of the interview recording produced in discovery, when asked whether he *ever* believed that to be the cause of the fire, Bush flatly denied having that belief and denied having told anyone that a rock strike started the fire. Nonetheless, in White's summary of the September 10, 2007 Bush interview, which was incorporated into the Moonlight report provided as a discovery response to interrogatories, White indicated " 'Bush reiterated the same information he had provided to . . . Reynolds,' " i.e., that the fire was caused by a bulldozer striking a rock. When White was asked during his deposition about the

38

inconsistency between his summary and the transcript of the recorded interview he offered no explanation for the discrepancy.

(ii)     Ryan Bauer interview

The summary of the interview with Ryan Bauer, who was cutting firewood with an altered chainsaw in the area near where the Moonlight Fire began, included by White in the Moonlight report, omits Bauer's unsolicited, demonstrably false alibi in which he volunteered, " 'I was with my girlfriend all day.  She can verify that if I'm being blamed for the fire.' "  Rather, the Moonlight report indicates Bauer noticed the fire from his girlfriend's house and had gone toward the fire to see if he could assist in removing equipment.  The omission of Bauer's voluntary statement renders the Moonlight report misleading with respect to his potential involvement.  The Moonlight report was provided as an interrogatory response in lieu of a particularized response, though the recording of the interview was produced in discovery.  Therefore, the trial court found, "[h]ad Defendants relied on Cal Fire's verified interrogator[y] [responses], this information would never have been discovered."

(iii)  Red Rock lookout interviews

On the day the fire started, Caleb Lief was manning the nearest federal lookout tower, known as Red Rock.  The Moonlight Fire was reported from this tower at 2:24 p.m.  At about 2:00 p.m., another federal employee, Karen Juska, went to the tower to bring supplies and for maintenance.  When she walked up the steps to the tower, she found Lief standing on the catwalk of the tower urinating on his bare feet, supposedly as a homeopathic cure to athlete's foot fungus.  When she walked into the cabin at the tower, she spied a glass marijuana pipe, which Lief placed in his back pocket; and, when he handed her the radio to repair, she smelled a heavy odor of marijuana on Lief's hand and on the radio.

None of this information, which the trial court deemed relevant to the inquiry whether Lief was properly performing his function, was contained or referenced in the written summaries of the interviews of Lief and Juska conducted and prepared by Reynolds's replacement, United States Forest Service special agent Diane Welton. The summaries are incorporated in Cal Fire's verified interrogatory responses in lieu of factual statements. The record indicates White learned of Lief's conduct sometime in 2008, but did not feel he had sufficient information to include it in the Moonlight report. Additionally, Juska testified Welton instructed her not to speak of these issues prior to her interview, and her draft report indicated she was asked to omit information because Lief's conduct was not being investigated.

   d.  *Spoliation of evidence*

White destroyed his field notes prepared during his investigation, a fact which he attempted to justify because his " 'field notes were destroyed only after the information in them was transferred to his Report [(the Moonlight report)], which was and is the common practice' " and that he " 'transferred all of the case file information to his laptop computer, so all this electronic information [is] in fact preserved.' " The trial court expressly found White not to be a credible witness in this regard. As proof supporting this finding, the trial court cited White's failure to record any information in the Moonlight report regarding placement of the white flag, photographs taken of the white flag, measurements and a GPS reading of the location of the rock where the white flag was placed, or the sketch in which the flag location was marked as the point of origin. Defendants discovered this all happened prior to the release of the scene only through discovery of Reynolds's notes from the United States Forest Service.

Additionally, because White had destroyed his copious field notes, the trial court found he was able to effectively and conveniently escape meaningful cross-examination because he could claim a lapse of memory when confronted with inconsistencies. White

40

claimed not to remember the white flag, not to remember learning of the marijuana paraphernalia and odor at the Red Rock lookout, and not to remember why his report of the September 10 interview with Bush is directly opposite of the transcript of that interview. The trial court deduced that had the notes not been destroyed, White's intent may have been revealed. That Cal Fire has since made it an official practice to destroy field notes is not helpful to Cal Fire's position in defending White's voluntary spoliation of evidence in the present case.

e.    *Inclusion of other false origin and cause reports*

Incorporated in the Moonlight report was a report about another fire—the Lyman Fire. The Moonlight report indicated that the investigation of the Lyman Fire revealed that it too was ignited when a bulldozer operated by a Howell employee struck a rock. However, the lead investigator of the Lyman Fire flatly contradicted that conclusion by testifying that the cause of the Lyman Fire was undetermined. The false report about the Lyman Fire was included in verified interrogatory responses in lieu of narrative factual statements.

2.    Legal Principles.

As noted above, the trial court relied on two separate sources of authority to impose discovery sanctions on Cal Fire: statutory authority provided by the Civil Discovery Act and common law authority premised on the court's inherent authority as described in *Slesinger*, *supra*, 155 Cal.App.4th 736. The trial court appeared to premise its award of monetary sanctions on the statutory authority alone, but its order imposing terminating sanctions was based on both sources of its authority. Thus, we discuss both the common law and statutory authority of the trial court to impose sanctions for discovery abuses.

Code of Civil Procedure section 2023.030 permits the trial court to impose as sanctions against anyone who has engaged in a misuse of the discovery process monetary

41

sanctions, issue sanctions, evidence sanctions, terminating sanctions, or contempt sanctions. Code of Civil Procedure section 2023.010 provides that the following, among others, are misuses of the discovery process: failing to respond or to submit to an authorized method of discovery; making, without substantial justification, an unmeritorious objection to discovery; making an evasive response to discovery; and disobeying a court order to provide discovery. Other sanctionable discovery abuses include providing false discovery responses and spoliation of evidence. (*Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1223 [terminating sanctions for intentional spoliation of evidence]; *Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 333-334 [sanctions for willfully false discovery responses].)

Under this statutory scheme, the trial court has broad discretion in selecting the appropriate sanction, and we must uphold the trial court's determination absent an abuse of discretion. (*Los Defensores, Inc. v. Gomez* (2014) 223 Cal.App.4th 377, 390 (*Los Defensores*).) Thus, we will reverse the trial court only if it was arbitrary, capricious, or whimsical in the exercise of that discretion. (*Ibid.*) As pertinent here, monetary sanctions, in an amount incurred, including attorney fees, by anyone as a result of the offending conduct, must be imposed unless the trial court finds the sanctioned party acted with substantial justification or the sanction is otherwise unjust. (Code Civ. Proc., § 2023.030, subd. (a).) However, terminating sanctions are to be used sparingly because of the drastic effect of their application. (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 604 (*Lopez*); see *Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 613-616.) Thus, under the statutory scheme, trial courts should select sanctions tailored to the harm caused by the misuse of the discovery process and should not exceed what is required to protect the party harmed by the misuse of the discovery process. (*Lopez*, *supra*, at p. 604.) Therefore, sanctions are generally imposed in an incremental approach, with terminating sanctions being the last resort. (*Ibid.*)

However, even under the Civil Discovery Act's incremental approach, the trial court may impose terminating sanctions as a first measure in extreme cases, or where the record shows lesser sanctions would be ineffective. (*Lopez,* at pp. 604-605; see *Van Sickle v. Gilbert* (2011) 196 Cal.App.4th 1495, 1516-1519; *Miranda v. 21st Century Ins. Co.* (2004) 117 Cal.App.4th 913, 928-929.)

Similarly, there exists a line of case law that authorizes the imposition of terminating sanctions as a first remedy based on the inherent power of the court in certain circumstances. In *Slesinger*, *supra*, 155 Cal.App.4th 736, a private investigator hired by the plaintiff entered onto the defendant's private property and trespassed into the facility that disposed of the defendant's confidential and privileged documents, improperly removed documents from both locations, and provided those documents to the plaintiff. The plaintiff then repeatedly disavowed knowledge of how it got those documents, claimed they were not used in the litigation, and failed to produce the documents in discovery despite appropriate requests for production. (*Id.* at pp. 741, 744-747, 768.) Based on this deliberate and egregious wrongdoing and the trial court's perception that no other remedy would adequately address the plaintiff's misconduct, the trial court exercised its inherent authority to protect the integrity of the judicial process and issued terminating sanctions against the plaintiff. (*Id.* at p. 756.) *Slesinger* upheld the trial court's exercise of discretion in imposing terminating sanctions based on the plaintiff's conduct, holding that "when a plaintiff's deliberate and egregious misconduct makes any sanction other than dismissal inadequate to ensure a fair trial, the trial court has inherent power to impose a terminating sanction." (*Id.* at pp. 740; see *id.* at pp. 765, 777.)

Under either schema, in reviewing the trial court's determination, "[w]e defer to the court's credibility decisions and draw all reasonable inferences in support of the court's ruling." (*Lopez*, *supra*, 246 Cal.App.4th at p. 604.) To the extent the trial court's decision to issue sanctions depends on factual determinations, we review the record for

43

substantial evidence to support those determinations. (*Los Defensores*, *supra*, 223 Cal.App.4th at p. 390.) Thus, our review " 'begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trial court].' " (*Id.* at pp. 390-391.) It is with these principles in mind that we review the trial court's finding that Cal Fire willfully misused the discovery process.

> 3. Monetary sanctions.

We are not persuaded there is substantial evidence to support a finding that Cal Fire engaged in a misuse of the discovery process by providing an origin and cause report that did not include information regarding what happened at the Red Rock lookout tower given the evidence relating to the timing and circumstances of White's learning about Lief's actions and history. Neither are we persuaded that omission of Bauer's unsolicited false alibi amounted to a falsehood rendering presentation of the Moonlight report a misuse of the discovery process, though the omission certainly made the Moonlight report misleading regarding Bauer's potential involvement in the fire's inception. Nonetheless, there is substantial evidence to support other factual findings made by the trial court that Cal Fire engaged in discovery abuses.

For example, by repeatedly presenting without limitation the Moonlight report that contained the false statement by Bush and the false Lyman Fire report as a discovery response (other than to interrogatories seeking identification of documents relating to contentions), Cal Fire engaged in sanctionable conduct by providing false discovery responses, even if it also provided responsive documents that permitted defendants to uncover the falsehoods and errors in the investigation report. And by White's providing untruthful or evasive deposition testimony regarding the white flag and destroying his field notes regarding the investigation, despite a reasonable expectation of civil litigation, Cal Fire again misused the discovery process. Finally, by failing to timely provide the

44

responsive WiFITER fund documents pursuant to court order on two separate occasions, Cal Fire engaged in yet another discovery violation. Thus, even in the absence of the discovery abuses that the trial court found based on exclusion of information about Lief and Bauer from the Moonlight report, we cannot conclude it was unreasonable, arbitrary, or capricious for the trial court to conclude that monetary sanctions were warranted in light of Cal Fire's numerous other discovery violations.

That said, we must also consider Cal Fire's contention that the amount of the monetary sanction is unreasonable. Monetary sanctions may include "the reasonable expenses, including attorney's fees, incurred by anyone as a result of [the] conduct" that comprises the misuse of the discovery process. (Code Civ. Proc., §2023.030, subd. (a).) Here, Cal Fire claims the trial court failed to make the requisite finding that the attorney fees and expert fees and expenses it awarded were incurred as a result of the discovery abuses, rendering its award of those fees and expenses an abuse of discretion. We agree the trial court abused its discretion in awarding certain attorney fees and expert fees and expenses as discovery sanctions. Therefore, we reverse the award of monetary sanctions and remand the matter for a further hearing.

The trial court entered three orders awarding discovery sanctions to be paid by Cal Fire. To Sierra Pacific, the trial court awarded $21,881,484, which comprised *all* of the attorney fees, expert fees, and other expert expenses it incurred in defending both the state action and the concurrent federal action since their inception, as adjusted by the 1.2 lodestar multiplier.[17] To Howell, Bush, and Crismon, the trial court awarded $1,571,741.28, which comprised attorney fees dating back to 2009 for defense of liability issues in the state court case and discovery and other issues in both the state and federal courts and expert fees to test Cal Fire's theory regarding how the fire began. And to

---

[17] See footnote 14, *ante*, page 32.

45

Beaty and landowner defendants, the trial court awarded $6,146,901.41, which comprised *all* attorney and expert fees they incurred in both the federal and state court actions.

The trial court reasoned that Cal Fire's discovery abuses "were the cause of all defense expenses incurred" after July 3, 2010, and that "[a]ll . . . defense expenses are, in one way or another, inextricably intertwined with the falsehoods and omissions" in the Moonlight report. Thus, it did not limit the sanctions to attorney fees or expert fees incurred *after* the discovery misuses it found occurred, but awarded attorney fees and expert fees beginning at the inception of litigation. Defendants offer two authorities for the proposition that *all* expenses incurred in litigation may be imposed as sanctions. Both are inapposite.

In *Qualcomm Inc. v. Broadcom Corp.* (S.D.Cal., Jan. 7, 2008, No. 05cv1958-B (BLM)) 2008 U.S.Dist. Lexis 911,[18] the district court relied on the Federal Rules of Civil Procedure and the inherent authority of courts to sanction litigants to prevent abuse of the judicial process when it awarded the defendant all its attorney fees and costs incurred in litigation. (2008 U.S.Dist. Lexis 911, pp. *27, *63.) However, neither basis for the court's ruling in *Qualcomm* applies here. Unlike the federal court in *Qualcomm*, the trial court here had no inherent power to impose monetary sanctions for misconduct absent statutory authority. (See *Olmstead v. Arthur J. Gallagher & Co.* (2004) 32 Cal.4th 804, 809.) Rather, the trial court's authority to issue discovery sanctions was delineated in Code of Civil Procedure section 2023.030. Thus, the trial court was limited to awarding only those "reasonable expenses, including attorney's fees, incurred by anyone as a result of" a misuse of the discovery process. (Code Civ. Proc., § 2023.030, subd. (a).) Therefore, it was an abuse of discretion for the trial court to award sanctions beyond

---

[18] *Qualcomm* was vacated in part on other grounds as stated in *Qualcomm Inc. v. Broadcom Corp.* (S.D.Cal., Apr. 2, 2010, No. 05cv1958-B (BLM)) 2010 U.S.Dist. Lexis 33889.

those authorized by section 2023.030, including any attorney or expert fees incurred *prior to* Cal Fire's misuses of the discovery process and any fees that were not the result of those misuses.

*Sherman v. Kinetic Concepts, Inc.* (1998) 67 Cal.App.4th 1152 is equally unavailing. There, the court found it was error for the trial court to deny a motion for sanctions based on former Code of Civil Procedure section 128.5 and former Code of Civil Procedure section 2023. (*Sherman*, *supra*, at pp. 1163-1164.) Here, no defendant moved for sanctions pursuant to Code of Civil Procedure section 128.5, which *would* permit a trial court to " 'order a party . . . to pay the reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay,' " and no order may be issued based on that section " 'except on notice contained in a party's *moving or responding papers*, or [on] the court's own motion, after notice and opportunity to be heard.' " (*Sherman*, *supra*, at p. 1164, quoting former Code Civ. Proc., § 128.5, subds. (a) and (c), respectively.) And *Sherman* does not stand for the proposition that monetary discovery sanctions may be awarded that exceed the statutory authority set forth in Code of Civil Procedure section 2023.030.

In general, the motions seeking fees as discovery sanctions and accompanying declarations provide ample evidence of *when* fees were incurred by defendants but do little to explain how those fees were incurred as a result of Cal Fire's discovery abuses. Therefore, we are unable to ascertain from the record which attorney fees and expert fees and expenses were incurred as a result of the discovery misuses for which we have concluded there is substantial evidence in the record to support imposition. However, we do note, for example, that in their motion for sanctions, Howell, Bush, and Crismon asserted they incurred $405,586.08 in expert fees to test Cal Fire's theory that the fire was caused by a hot metal particle being splintered from a bulldozer track upon a rock

47

strike, including $223,404.26 in expert fees they claim were incurred as a direct result of Cal Fire's failure to test its ignition theory prior to issuing the Moonlight report. While the information obtained as a result of this expert analysis may have been used in the course of depositions and in reviewing discovery to reveal that the Moonlight report was deficient or even false, they have not shown that the fees were incurred *as a result* of *discovery violations* engaged in by Cal Fire. Accordingly, we reverse the trial court's award of monetary discovery sanctions and remand this matter to the trial court to conduct a hearing to determine the "reasonable expenses, including attorney's fees, incurred by [defendants] as a result of" Cal Fire's misuses of the discovery process. (Code Civ. Proc., § 128.5, subd. (a).)

4.    <u>Terminating sanctions</u>.

a.    *Jurisdiction to impose postjudgment*

As noted above, after judgment was entered, the trial court considered defendants' motions for discovery sanctions against Cal Fire, and granted the motions by imposing both monetary and terminating sanctions against Cal Fire. Cal Fire does not dispute the trial court's jurisdictional capacity to award monetary sanctions but argues the trial court lacked jurisdiction to impose a terminating sanction postjudgment, claiming the latter sanction is a second judgment violating the one final judgment rule. We disagree.

Generally speaking, " 'there can be only one final judgment in a single action.' " (*Cuevas v. Truline Corp.* (2004) 118 Cal.App.4th 56, 60.) And, an order of dismissal constitutes a judgment if it is in writing, signed by the court, and filed in the action. (Code Civ. Proc., § 581d; *Etheridge v. Reins Internat. California, Inc.* (2009) 172 Cal.App.4th 908, 913.) Thus, when the trial court entered its order dismissing the actions based on its grant of the motion for judgment on the pleadings and its determination that plaintiffs had failed to present a prima facie case, as discussed earlier in our opinion, the trial court entered judgment in this action (case No. C074879). If, as

48

Cal Fire contends, the trial court's order imposing terminating sanctions is also a judgment, this subsequent order would be jurisdictionally problematic. (See Code Civ. Proc., § 916, subd. (a) ["[T]he perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order, but the trial court may proceed upon any other matter embraced in the action and not affected by the judgment or order."].)

Here, postjudgment and after an appeal of the judgment was perfected (case No. C074879), the trial court elected to "impose[] terminating sanctions" on Cal Fire and ordered that "[t]erminating sanctions shall issue against Cal Fire." Contrary to Cal Fire's assertion, this order is not a judgment. The order does not purport to dismiss the action nor otherwise equate with rendition of judgment. (See *Good v. Miller* (2013) 214 Cal.App.4th 472, 475.) In fact, generally, this is not even a separately appealable order. (Code Civ. Proc., § 904.1; but see *Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 940 ["An order granting terminating sanctions is not appealable, and the losing party must await the entry of the order of dismissal or judgment *unless* the terminating order is inextricably intertwined with another, appealable order."].) Rather, the trial court's order awarding terminating sanctions has no effect at all unless and until the trial court enters a judgment of dismissal or other order effectuating its award of terminating sanctions. The trial court may enter such a judgment as to remaining defendants—i.e., not Sierra Pacific, Beaty, or landowner defendants in whose favor judgment of dismissal was entered pursuant to an award of judgment on the pleadings as discussed in part I.B., *ante*— following remand in case No. C074879 pursuant to our reversal of the judgment of dismissal premised on the trial court's July 26, 2013 order finding plaintiffs failed to establish a prima facie case.

Moreover, this postjudgment proceeding is collateral to the appeal because it is based on Cal Fire's alleged prejudgment discovery abuses, for which sanctions proceedings could have occurred regardless of the outcome of the appeal of the judgment. (See *Gridley v. Gridley* (2008) 166 Cal.App.4th 1562, 1587; see also *Day v. Collingwood* (2006) 144 Cal.App.4th 1116, 1124-1125.) Indeed, though motions concerning discovery are generally to be heard no less than 15 days before the date initially set for trial (Code Civ. Proc., § 2024.020, subd. (a)), the Civil Discovery Act does not on its face limit the ability of the trial court to impose sanctions for violation of its provisions to prejudgment motions for sanctions. If we were to construe the Civil Discovery Act as being so limited, it would permit the absurd situation in which those who have misused the discovery process can avoid penalty if they are able to keep their misuse secret until after that deadline passes. Neither can we construe the Civil Discovery Act as allowing only monetary sanctions postjudgment, as Cal Fire argues. If the trial court were prevented from exercising its discretion in this collateral postjudgment proceeding to impose whatever sanction it deems appropriate, the effect could prejudice the party seeking sanctions and cause an undue waste of judicial resources. For, if, as here, the underlying judgment of dismissal is reversed and remanded (as here), issues and evidence that would have been excluded or a case that should be the subject of terminating sanctions would have to be litigated simply because the discovery misuse came to the trial court's attention postjudgment. We are not persuaded the Civil Discovery Act should be construed to allow such a result. Therefore, the trial court had jurisdiction to impose terminating sanctions.

b.     *Propriety of order imposing terminating sanctions*

As discussed in part II.B.2., *ante*, terminating sanctions are authorized both by the Civil Discovery Act and by common law. Here, the trial court relied on both Code of Civil Procedure section 2023.030 and its inherent authority when it imposed terminating sanctions against Cal Fire. The trial court found that Cal Fire's " 'willful,' " "repeated

50

and egregious" misuses of the discovery process "permeated nearly every single significant issue in this case" to an extent that " 'threatened the integrity of the judicial process' " and made it implausible that defendants could ever receive a fair trial. The trial court further stated that "Cal Fire's actions in initiating, maintaining, and prosecuting this action, to the present time [(postjudgment)] [are] corrupt and tainted. Cal Fire failed to comply with discovery obligations, and its repeated failure was willful. . . . Cal Fire's conduct reeked of bad faith. . . . [C]al Fire failed to comply with discovery orders and directives, destroyed critical evidence, failed to produce documents it should have produced months earlier, and engaged in a systematic campaign of misdirection with the purpose of recovering money from Defendants." It also found that less severe sanctions would be unworkable and ineffectual, which certainly implies that it considered imposing monetary, issue, and evidentiary sanctions and found them insufficient.

As discussed above, there is substantial evidence to support the trial court's finding that Cal Fire: (1) failed to comply with discovery orders to produce several thousand pages of the WiFITER fund documents on two separate occasions, and that the failure to comply, even if not deliberate, evinced a disregard for the discovery process; (2) repeatedly presented false, misleading, or evasive discovery responses by presenting—without limiting comment—the Moonlight report as a responsive document even though it contained a statement of causation falsely attributed to Bush and a Lyman Fire report falsely attributing fault to Howell; (3) presented false or evasive deposition testimony by White; and (4) engaged in spoliation when White improperly destroyed his field notes despite probable civil litigation. There is also certainly evidence in the record to suggest that the existence of the WiFITER fund caused investigators to have a motive for bias in their investigation of wildfires that may result in a civil cost recovery; that Cal Fire mislead the trial court about what would be contained in the WiFITER fund documents that were not timely produced thereby causing exclusion of the WiFITER

51

fund documents from trial; and that the Moonlight report excluded information that probably should have been included or investigated, including Bauer's unsolicited alibi, Lief's questionable conduct, and any reference to or explanation for the white flag. In view of this cumulative evidence, we cannot find the trial court abused its discretion in imposing terminating sanctions based on its finding Cal Fire engaged in egregious and deliberate misconduct that made any other sanction inadequate to protect the judicial process and to ensure a fair trial.

## C.    *Attorney Fees*

Defendants moved for attorney fees as prevailing parties (1) on a contractual basis, pursuant to Health and Safety Code sections 13009 and 13009.1, Civil Code section 1717, and Code of Civil Procedure section 1021.8, and (2) because the action resulted in the enforcement of important rights affecting the public interest, pursuant to Code of Civil Procedure section 1021.5 and *Serrano v. Priest* (1977) 20 Cal.3d 25, 46-47. The trial court agreed that defendants were entitled to attorney fees as prevailing parties on both bases. Cal Fire contends the trial court erred in awarding attorney fees on either basis. We conclude there is no contractual basis for attorney fees in the instant matter, and the trial court abused its discretion in awarding attorney fees based on Code of Civil Procedure section 1021.5.

Before we begin our analysis of the merits of the trial court's orders awarding attorney fees to defendants as prevailing parties, we must address some basic issues appearing on the face of those orders. The trial court awarded to Sierra Pacific $21,100,723.20 in attorney fees, expert fees, expert expenses, and expert costs as prevailing party to be recovered exclusively from Cal Fire. However, of this amount, only $17,088,753.60 may even potentially be recovered as *attorney fees* on the bases presented. (See Civ. Code, § 1717 [providing for award of attorney fees to prevailing party in an action on a contract]; see also *Olson v. Automobile Club of Southern*

52

*California* (2008) 42 Cal.4th 1142, 1148 [Code Civ. Proc., § 1021.5 authorizes recovery of attorney fees, not expert witness fees or expenses].)[19]  Additionally, of the cumulative amount of $6,146,901.41 in attorney fees and expert fees the trial court collectively awarded to Beaty and landowner defendants, only $4,837,720.50 in *attorney fees* awarded in the order have the potential of being awarded on these bases.  The trial court collectively awarded to Howell, Bush, and Crismon as prevailing parties attorney fees of $1,166,155; however, Howell, Bush, and Crismon are not prevailing parties as to any plaintiff in light of the conclusions we reach in part I., *ante.*  The attorney fee award to those three defendants is necessarily vacated.

      1.    <u>No contractual basis</u>.

One of the bases on which the trial court purportedly relied in awarding attorney fees to the prevailing defendants was Civil Code section 1717, which provides that where a contract "specifically provides" for recovery of attorney fees and costs following an action to enforce a contract, the trial court may award reasonable attorney fees to the prevailing party.  Here, however, there is no contract "specifically provid[ing]" for recovery of attorney fees.  Rather, the trial court relied on language in sections 13009 and 13009.1, which provide in relevant part that the charge for fire suppression costs, rescue or emergency medical service costs constitute "a debt of that person [found liable under sections 13009 or 13009.1], and is collectible by the person, or by the federal, state, county, public, or private agency, incurring those costs in the same manner *as in the case of an obligation under a contract, expressed or implied*" (§§ 13009, subd. (a) & 13009.1, subd. (e), italics added), combined with Code of Civil Procedure section 1021.8, which provides that when the Attorney General prevails in a civil action based on sections

---

[19]  We note also that the trial court awarded expert fees as part of its costs award to Sierra Pacific, despite the absence of any Code of Civil Procedure section 998 offer in the record.  That costs award has been reversed and remanded, as discussed in part I., *ante*.

13009 and 13009.1, *inter alia*, the Attorney General is to be awarded his or her "costs of investigating and prosecuting the action, *including expert fees, reasonable attorney*[] *fees, and costs*" (Code Civ. Proc., § 1021.8, subd. (a), italics added).  We conclude these statutes, even when taken together, do not support a finding that there was a contractual basis for awarding attorney fees to defendants.

Contrary to the necessarily implied assertion of defendants that sections 13009 and 13009.1 create a contract between the parties, "the instant statutes only specify that the listed costs [recoverable under the statutes] are debts deemed collectible by the state 'in the same manner' as contract obligations.  Such language does not transform the liability into a contract . . . ."  (*Department of Forestry & Fire Protection v. LeBrock* (2002) 96 Cal.App.4th 1137, 1141-1142.)  "The statutory language regarding how the state may collect the costs listed is merely a procedural mechanism.  There is no contract between the parties that expressly, or even impliedly, provides for recovery of attorneys fees." (*Id.* at p. 1142.)  Neither is the *statutory* mandate that the Attorney General recover his or her attorney fees in a case premised on Health and Safety Code sections 13009 or 13009.1, as codified in Code of Civil Procedure section 1021.8, cause to construe sections 13009 and 13009.1 as otherwise forming a contractual basis on which to recover fees.  Rather, as with a great many other statutory provisions providing for recovery of attorney fees, Code of Civil Procedure section 1021.8 is a unilateral *statutory* basis for fee recovery.  (*LeBrock*, *supra*, at p. 1142 ["[M]any statutory provisions which . . . provide for attorney[] fees are one-sided.  They expressly shift fees to advance public interests, such as encouraging citizens to put fire safety measures in place."].)  Therefore, as a *statutory* rather than *contractual* authorization for fee recovery, it does not trigger the reciprocity provisions of Civil Code section 1717.  (*LeBrock*, *supra*, at pp. 1141-1142.)

Accordingly, we conclude the trial court erred in awarding attorney fees to defendants as prevailing parties on a contractual basis pursuant to Health and Safety

54

Code sections 13009 and 13009.1, Civil Code section 1717, and Code of Civil Procedure section 1021.8.

      2.    <u>Public benefit</u>.

The other statutory basis on which the trial court purportedly awarded attorney fees was that codified in Code of Civil Procedure section 1021.5, which states in part that "[u]pon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."  On appeal, Cal Fire contends the trial court erred in awarding attorney fees on this basis because (1) it improperly weighed the public benefit against the benefit defendants received rather than weighing the financial burden incurred by defendants against their potential exposure, and (2) the judgment did not confer a public benefit.  We conclude the trial court abused its discretion in awarding attorney fees on this basis because it failed to consider the comparative financial burden and exposure defendants faced in litigation as required by Code of Civil Procedure section 1021.5.

"[T]he necessity and financial burden requirement [of Code of Civil Procedure section 1021.5] ' "really examines two issues:  whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys." '  [Citations.]  The 'necessity' of private enforcement ' " ' "looks to the adequacy of public enforcement and seeks economic equalization of representation in cases where private enforcement is necessary." ' " ' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214-1215.)  In determining the financial burden on litigants for purposes of the second prong of this inquiry, "courts have quite logically

55

focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield. ' "An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' " ' " (*Id.* at p. 1215.)  Where, however, the party "had a 'personal financial stake' in the litigation 'sufficient to warrant [the] decision to incur significant attorney fees and costs in the vigorous prosecution [or defense]' of the lawsuit, an award under [Code of Civil Procedure] section 1021.5 is inappropriate."  (*Millview County Water Dist. v. State Water Resources Control Bd.* (2016) 4 Cal.App.5th 759, 768-769.)

Here, there is no indication the trial court considered defendants' litigation costs or potential financial benefits or burdens defendants would realize through litigation. Rather, the trial court went on at length to justify its finding that defendants conferred a significant public benefit in the course of their defense of the action by exposing and leading to the closure of the WiFITER fund, by prevailing on a summary adjudication in which the trial court interpreted a regulation (Cal. Code Regs., tit. 14, § 938.8) as not creating a legal duty on landowners for fires caused by third parties, and by exposing dishonesty, investigative corruption, and a pervasive violation of discovery rules by a public entity.  The trial court found that "motivation due to some personal interest, which all defendants must undeniably have, is not fatal to an award of fees under [Code of Civil Procedure] section 1021.5."  The trial court continued, stating that "[t]he question this Court must answer is whether the broad public benefits conferred by the Moonlight Fire litigation were simply coincidental to the defense of the case.  While the Court is aware that any successful defense benefits the defendant, it also finds that the benefits conferred upon the citizens of California went far beyond the stake these Defendants had in defending themselves and were not merely coincidental in nature."

56

The trial court did not in any way discuss or appear to weigh the financial burden defendants incurred in pursuing their defense of the litigation or any potential financial exposure defendants faced in the litigation, and there does not appear to have been any effort on the part of defendants to present evidence in their motions for fees, expenses, and sanctions to permit the trial court to engage in such an inquiry. Additionally, it does not appear that if the court had engaged in such an inquiry, it could reasonably have found defendants' costs in pursuing their legal victory transcended their personal interest in avoiding liability to warrant an award of attorney fees pursuant to Code of Civil Procedure section 1021.5. For, even though the attorney fees, expert fees, and other costs incurred by defendants here are substantial, so too was the potential liability defendants faced in the litigation. For instance, we know Cal Fire sought to recover from defendants fire suppression, investigation, accounting, and administrative costs in the amount of $8,441,309.99. Additionally, if Cal Fire prevailed, defendants would also have been liable to the Attorney General for what would amount undoubtedly to several million dollars for "all costs of investigating and prosecuting the action, including expert fees, reasonable attorney's fees, and costs." (Code Civ. Proc., § 1021.8, subd. (a).) Moreover, although there was no evidence presented on the issue, there is some indication other plaintiffs sought damages in the tens of millions of dollars. All told, the financial exposure defendants faced was decidedly not out of proportion with the financial burden they incurred in defending the action. Therefore, the trial court erred in awarding attorney fees to defendants as prevailing parties on this basis as well.

**D.**    *Costs of Proof Award*

Defendants moved for attorney fees pursuant to Code of Civil Procedure section 2033.420, subdivision (a) because Cal Fire failed to admit the truth of certain matters in response to propounded requests for admission. On appeal, Cal Fire contends the trial court erred in awarding attorney fees for defendants because "defendants did not, and could not, disprove the truthfulness of Cal Fire's responses to the requests for admission

57

at issue." We do not reach the merits of this contention because, despite the trial court's apparent finding that defendants were entitled to these costs of proof, it did not actually make any separate award of costs of proof pursuant to Code of Civil Procedure section 2033.420. Thus, Cal Fire has failed to demonstrate any error on the face of the record for this court to review with regard to an order awarding costs of proof pursuant to Code of Civil Procedure section 2033.420 because it has not shown there is any such award. (See *Gonzalez v. Rebollo* (2014) 226 Cal.App.4th 969, 976.)

### III.  Challenges to Judge[*]

Finally, plaintiffs request that we require any remand proceedings be conducted by a different trial judge. We are obligated to consider this request by Code of Civil Procedure section 170.1, subdivision (c), which states: "At the request of a party . . . an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."

Here, plaintiffs claim the request should be granted because "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) The facts, as plaintiffs see them, are that Judge Nichols deprived them, without a legitimate reason, of a trial on the same law and evidence that a judge who had previously heard law and motion proceedings and another court in a separate but related federal case had deemed sufficient to proceed to trial. Additionally, plaintiffs assert there is a reasonable doubt Judge Nichols would be impartial after reversal, especially because the procedures employed here were unfair, and because Judge Nichols is a visiting retired judge forced to hear a lengthy trial in a remote and rural location.

---

[*]  See footnote, *ante*, page 1.

Our review of the record does not reveal any evidence of prejudice or bias on the part of Judge Nichols that would warrant his disqualification on remand. And erroneous rulings are not themselves sufficient evidence of bias to warrant removal. (*Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 59-60.) Accordingly, we conclude the interests of justice do not warrant any order from this court requiring that future trial court proceedings be conducted by a different judge.

## DISPOSITION

In case No. C074879, the judgment of dismissal as to Cal Fire's claims against Beaty, Sierra Pacific, and landowner defendants is affirmed. The judgment of dismissal as to all other claims is reversed, and the matter is remanded to the trial court for further proceedings.

In case No. C076008, the postjudgment award of costs to defendants Sierra Pacific, Beaty, and landowner defendants as prevailing parties against Cal Fire is remanded for further proceedings to calculate an appropriate award for costs incurred in defending Cal Fire's action pursuant to Code of Civil Procedure sections 1032 and 1033.5. All other postjudgment orders awarding costs to prevailing parties are necessarily vacated as a result of our conclusion in case No. C074879. The postjudgment award of attorney fees to defendants Howell, Bush, and Crismon is also necessarily vacated, as they are no longer prevailing parties as to any plaintiff. Additionally, we reverse the postjudgment awards of attorney fees to defendants Sierra Pacific, Beaty, and the landowner defendants as prevailing parties against Cal Fire. We also reverse the postjudgment order imposing monetary discovery sanctions against Cal Fire and remand for further proceedings to determine the recoverable expenses pursuant to Code of Civil Procedure section 2023.030. The postjudgment order imposing terminating sanctions against Cal Fire is affirmed.

59

Plaintiffs and appellants, other than Cal Fire, are entitled to their costs on appeal in case No. C074879.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)  All parties are responsible for their own costs in case No. C076008.  (*Id.*, rule 8.278(a)(5).)

                                        BUTZ                    , J.


I concur:


            NICHOLSON      , Acting P. J.

60

ROBIE, J.

I respectfully dissent.

First, the majority finds that the trial court's decision to grant judgment on the pleadings to Sierra Pacific, Beaty, and landowner defendants was proper because Health and Safety Code sections 13009 and 13009.1[1] do not incorporate common law theories of negligence, including vicarious liability, to hold anyone besides a direct actor liable for the cost of that fire's suppression. I cannot agree.

As the majority notes, section 13009 states in relevant part, "[a]ny person (1) who negligently, or in violation of the law, sets a fire, allows a fire to be set, or allows a fire kindled or attended by him or her to escape onto any public or private property . . . is liable for the fire suppression costs incurred in fighting the fire and for the cost of providing rescue or emergency medical services, and those costs shall be a charge against that person." Section 13009.1 repeats the basic language of section 13009 concerning who may be held liable for the cost of fire suppression. Further, section 19 of the same code defines a person as "any person, firm, association, organization, partnership, business trust, corporation, limited liability company, or company." A plain reading of these statutes appears to extend liability for the cost of fire suppression to corporations or companies through vicarious liability. "Any person" as used in sections 13009 and 13009.1 includes companies and corporations (see § 19); these entities can only act through their agents and thus can only be found negligent through vicarious liability. (*Snukal v. Flightways Manufacturing, Inc.* (2000) 23 Cal.4th 754, 782 [" 'corporations necessarily act through agents' "].) To read otherwise would ignore the definition of "person" contained in the Health and Safety Code. Thus, sections 13009 and 13009.1 can be read to impose liability for the costs of fire suppression through vicarious liability.

---

[1] Further section references are to the Health and Safety Code.

1

I believe the statutory history supports this interpretation. As my colleagues note, chapter 790, enacted in 1931, imposed liability for the cost of property damage to "Any person who: [¶] (1) *Personally or through another*, and [¶] (2) Wilfully, negligently, or in violation of law, commits any of the following acts: [¶] (1) Sets fire to, [¶] (2) Allows fire to be set to, [¶] (3) Allows a fire kindled or attended by him to escape to the property, whether privately or public owned, of another." (Stats. 1931, ch. 790, § 1, p. 1644, italics added.) This language appears to mirror modern day section 13007. Chapter 790, section 2, imposes liability for cost of property damage to "*Any person* who allows any fire burning upon his property to escape to the property, whether privately or publicly owned, of another, without exercising due diligence to control such fire." (Stats. 1931, ch. 790, § 2, p. 1644, italics added.) This language appears to mirror modern day section 13008. Importantly, section 2 omits the language "[p]ersonally or through another" that is found in the first section of chapter 790.

Three years after the enactment of chapter 790, this court in *Haverstick v. Southern Pac. Co.* (1934) 1 Cal.App.2d 605, found sufficient evidence to hold the "Southern Pacific Company (a Corporation)" liable to a landowner after a train operated by Southern Pacific caught fire during a run from Galt to Ione and, through the lack of "ordinary care and diligence" of Southern Pacific's employees, the fire was allowed to spread from Southern Pacific's property to the landowner's property. There was "[n]o real explanation" for how the fire started. (*Id.* at pp. 605, 607, 610.) Although the opinion does not specify whether the railroad's liability was predicated upon section 2, this appears to be so because the employees of the railroad did not kindle or set any fire, but merely allowed fire burning on the railroad's property to spread to the property of another through a lack of due diligence. (Compare Stats. 1931, ch. 790, §§ 1 and 2; see also *People v. Southern Pacific Co.* (1983) 139 Cal.App.3d 627, 636-638 [under §§ 13007 and 13009, a jury must find a defendant negligently started or kindled a fire, not merely negligently failed to extinguish it].) Because liability was likely predicated

2

pursuant to section 2 (Stats. 1931, ch. 790), the railroad was found vicariously liable based on the language "[a]ny person" and not the additional language of "[p]ersonally or through another" found in section 1.

In 1939, the Health and Safety Code was enacted and included section 19, which defined a person as "any person, firm, association, organization, partnership, business trust, corporation, or company." (Stat. 1939, ch. 60, p. 484, § 19.) The code did not include a section devoted to fire protection. Then in 1953, chapter 790 was codified into the Health and Safety Code and sections 13007, 13008, and 13009 were enacted, each reflecting the language used in chapter 790 sections 1 through 3 respectively. (Stats. 1953, ch. 48, p. 682, §§ 1-3.) Section 13009, explicitly referenced sections 13007 and 13008 and allowed for the collection of fire suppression costs when someone was responsible for a fire as described by those sections. Then, after *People v. Williams* (1963) 22 Cal.App.2d 152, it appears the Legislature *rewrote* section 13009 (not merely transferred the language from a prior chapter) to allow for liability in the situation where a fire does not escape to another's property. During the rewrite, the Legislature removed references to section 13007 and 13008; however, this time it had the benefit of the definition of "person" within the same code as the fire prevention statutes and *Haverstick*'s finding of liability upon a corporation through the acts of its employees. Thus, when the Legislature wrote "any person" without the language "who personally or through another," it still intended to extend liability to those who must act vicariously through their agents.

The majority concludes that such an interpretation would render the language "who personally or through another" in section 13007 meaningless. However, the interpretation the majority gives to section 13009, renders the definition of "person" meaningless and would result in corporations or companies never being held liable for fire suppression costs. This is highlighted by the example given in the majority opinion. The opinion distinguishes *County of Ventura v. So. Cal. Edison Co.* (1948) 85

3

Cal.App.2d 529, from the present case because it was decided before section 13009 removed reference to section 13007 and because liability was imposed "not on a third party with some responsibility to supervise or oversee the actor, but on the actor itself that failed to properly maintain its own equipment that directly caused the fire." While the first reason distinguishing the case is sound, I do not see how Southern California Edison Co. is a direct actor. "The trial court found the cause of the fire to be the negligent construction and maintenance of the transmission and telephone lines by the Edison Company." (*Ventura County v. So. Cal. Edison Co.*, *supra*, 85 Cal.App.2d at p. 531.) As a corporation, the Edison Company *cannot* act. (See *Snukal v. Flightways Manufacturing, Inc.*, *supra*, 23 Cal.4th at p. 782.) Its agents/employees *can act* by constructing and maintaining or by imposing policies for the adequate construction and maintenance of company equipment. It was the employees' failure to act in such a way that led to the vicarious liability of the Edison Company. I do not see a meaningful difference between the negligence of a company when the cause of a fire was an employee's overt act versus the same employee's failure to act.

Cases brought under section 13009 involving companies or organizations further highlight this point. In *People ex rel. Grijalva v. Superior Court* (2008) 159 Cal.App.4th 1072, 1075-1076, a water conservation district admitted liability after a complaint was filed for breach of contract, negligence, negligence per se, and public nuisance, when "[a] spark from construction equipment operated by an employee of [the water conservation district] started a brush fire." Although liability was admitted, the start of this fire is nearly identical to the start of the Moonlight Fire here (spark from equipment operated by an employee), but because it is phrased as a failure to act by the organization, which resulted in a public nuisance, the majority opinion would deem it properly brought.

Also in *People v. Southern Pacific Co.*, *supra*, 139 Cal.App.3d at pages 632, 636 through 640, the court found a jury instruction harmless and the verdict holding Southern Pacific liable for fire suppression costs proper when a spark from a train started a fire.

4

The negligence theory relied upon was "negligent maintenance or *operation* of the fire extinguisher, and . . . failure to clear combustible vegetation from the right-of-way in the area where the fire started." (*People v. Southern Pacific Co.*, *supra*, 139 Cal.App.3d at p. 633, italics added.) As in *People ex rel. Grijalva*, the theory of negligence can be stated as an overt act of an employee and as a failure of that employee to act in some way that then caused the fire. On this note, whether a company's negligence proximately caused the fire is still a question left to the fact finder and could serve to negate liability for fire suppression where an employee's acts do not comport with company policy and cannot be said to be a product of the company's negligence.

Finally, I do not believe a reading of section 13009 that includes vicarious liability renders subdivision (a)(2) and (a)(3) of that section meaningless. The majority states that "[w]ere it possible for section 13009 and 13009.1 to be applied to one who did not through his direct action proximately cause the fire . . . there would have been no cause to amend the statute to extend liability to one who has the right and responsibility to cure a noticed fire hazard but fails to do so." Not so. Four years before the amendment of section 13009 in 1987, *People v. Southern Pacific Co.*, *supra*, 139 Cal.App.3d at pages 636 through 637, held it error to instruct the jury that it could find liability under section 13009 solely on a theory that the defendant negligently failed to extinguish a fire, without finding the defendant was negligently responsible for kindling a fire. The court "conclude[d] that liability for firefighting expenses under section 13009 is limited to the situations in which liability for property damage exists under section 13007" and that a defendant must be found to have been responsible through its negligent conduct to have started or kindled the fire. (*People v. Southern Pacific Co.*, *supra*, 139 Cal.App.3d at p. 638.) Section 13009, subdivision (a)(2) and (a)(3) allow for liability upon a showing that a fire occurred on the property and someone with the right to correct a fire hazard failed to do so when notified. This subdivision does not require a showing that the

5

conduct of failing to maintain the property actually kindled the fire or that the fire originated on the property in question.

This interpretation is supported by *City of Los Angeles v. Shpegel-Dimsey, Inc.* (1988) 198 Cal.App.3d 1009. There, a court found a company was not liable under the pre-1987 version of section 13009 for fire suppression costs despite the company being notified 55 times of fire code violations. (*City of Los Angeles*, at p. 1015.) Although the company was in violation of the fire code, the chemicals it stored were not spontaneously combustible and the fire that ignited on the property was alleged only to have grown because of the company's negligence, not to have started because of negligence. (*Id.* at pp. 1015-1016.) Thus, the company fell "within none of the classes of persons held liable" under section 13009. (*City of Los Angeles*, at pp. 1019-1020.) The court noted that the amendment to section 13009 would have made the company unequivocally liable for fire suppression costs because it failed to correct a fire hazard prohibited by law. (*City of Los Angeles*, at p. 1019, fn. 2.)

For these reasons, I believe sections 13009 and 13009.1 can be read to hold companies vicariously liable for the acts of their employees. I cannot agree with my colleagues' conclusion to the contrary.

With this interpretation of the statute and the resulting denial of the motion for judgment on the pleadings, I too would reverse the award of costs to defendants, but in its entirety, not just for the reasons the majority finds the court's ruling infirm.

Further, I believe, the trial judge was not fair and impartial in much of the proceedings, and it is clear to me that he became embroiled and acted impulsively and thus erred in many other ways. For example, I agree with the majority's conclusion to reverse for fundamental due process reasons the *Cottle*[2] ruling of the trial court.

---

[2] *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367.

6

However, this sua sponte action by the trial court demonstrates how profoundly biased the trial judge was.

In this same vein, I cannot agree to affirm the terminating sanctions imposed for discovery abuses. The number of documents to be produced was enormous. Therefore, late production of 7,000 pages, while not minor, must be considered in context. Terminating sanctions are to be a last resort "and should be used sparingly," after lesser sanctions are not sufficient. (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 604.) "A trial court must be cautious when imposing a terminating sanction because the sanction eliminates a party's fundamental right to a trial, thus implicating due process rights." (*Ibid.*) There is no indication the trial court imposed intermediate sanctions. After all, he could have refused admission of certain evidence which was the subject of abuse. Or he could have deemed as admitted facts that were the subject of late discovery. He also could have imposed monetary sanctions as an intermediate remedy. But, just as the trial court acted impulsively in ruling on an oral motion for judgment on the pleadings and in abruptly raising on its own motion and imposing the *Cottle* remedy one week before trial, the trial court impulsively granted terminating sanctions.

Not only did the trial court fail to consider incremental sanctions, the court also failed to justify why those incremental sanctions would not have been effective. My colleagues also fail to justify why incremental sanctions for the discovery violations would not have been effective. Indeed, judgment on the pleadings and dismissal had already been entered in favor of a majority of defendants, thus making terminating sanctions at this stage of the proceedings overkill and not "required to protect the interests of the party entitled to but denied discovery." (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.*, *supra*, 246 Cal.App.4th at p. 604.) "The trial court should select a sanction that is ' " 'tailor[ed] . . . to the harm caused by the withheld discovery.' " ' " (*Ibid.*) Here, terminating sanctions were not tailored to the harm caused

7

by the withheld discovery because the case had already been resolved as to a majority of the defendants at the time the court imposed the terminating sanctions.

Further, I do not believe that terminating sanctions were justified by CalFire's conduct. The majority finds, and I agree, that substantial evidence did not support a finding of misuse of discovery practices where the Ryan Bauer interview and the Red Rock lookout interviews were concerned. Despite this finding, however, the majority opinion cites these two instances as justification for terminating sanctions. Further, neither the trial court nor the majority opinion found CalFire deliberately withheld thousands of WiFITER documents, and merely conclude that CalFire's conduct "evinced a disregard for the discovery process." The terminating sanctions appear to rest on this nonwillful conduct and Investigator White's willful conduct of preparing a misleading report, giving false deposition testimony, and destroying his field notes. Where the destruction of the field notes is concerned, however, it should be noted that law enforcement officers routinely destroy their notes once they have prepared a report and that it was White's routine practice to do so, in addition to being CalFire's official practice at the time of the hearing. I do not see White's destruction of his notes as rising to the level of intentional spoliation. Thus, the only conduct left that evinced a deliberate misuse of the discovery process was White's misleading report and false deposition testimony. Surely, a lesser sanction could have been structured to deal with this one person's conduct. (See *Lopez v. Watchtower Bible & Tract Society of New York, Inc.*, *supra*, 246 Cal.App.4th at pp. 604-606 [terminating sanctions not proper when party willfully withheld documents because record did not reflect that court could not have obtained compliance with lesser sanctions].)

Finally, I also cannot agree that any remand be before the same trial judge, who I believe was manifestly biased and did not provide a fair and impartial forum for litigation of an enormously important case with vast ramifications beyond the facts of this proceeding. The conduct of the trial court in making the *Cottle* ruling, granting judgment

8

on the pleadings and then issuing postjudgment terminating sanctions were not the actions of a fair and impartial judge.

/s/_____,
Robie, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

**(Plumas)**

----

| | |
|---|---|
| DEPARTMENT OF FORESTRY AND FIRE PROTECTION et al., | C074879, C076008 |
| Plaintiffs and Appellants, | (Super. Ct. Nos. CV09-00205 (lead), CV09-00231, CV09-00245, CV10-00255, CV10-00264) |
| v. | |
| EUNICE E. HOWELL et al., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on December 6, 2017, was certified for partial publication in the Official Reports. For good cause it now appears that the opinion should be published in full in the Official Reports and it is so ordered. There is no change in judgment.

FOR THE COURT:


    NICHOLSON    , Acting P. J.


    ROBIE    , J.


    BUTZ    , J.